THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* DONALD CHARLES HARMON, Defendant-Appellant.

Fourth District    No. 15899

Opinion filed November 24, 1980.

MILLS, P. J., dissenting.

Ronald L. Hamm, of Hamm & Hanna, Ltd., of Peoria, for appellant.

Richard M. Banner, State's Attorney, of Eureka (Gary J. Anderson and Darryl Pratscher, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE CRAVEN delivered the opinion of the court:

Donald Harmon, the defendant, was convicted in the circuit court of Woodford County by a jury of the theft of a CB transceiver valued at less than $150. As he had also been convicted of theft in 1965, the present offense was a Class 4 felony (Ill. Rev. Stat. 1979, ch. 38, par. 16—1(e)(1)), and defendant was sentenced to 18 months' imprisonment.

On appeal, defendant contends that the CB transceiver upon which his prosecution was based was illegally seized from his home in violation of his rights under the fourth amendment, that the trial court erred in denying his motion to suppress that evidence, and that he was denied a fair trial and due process of law by the use of a 14-year-old prior conviction to elevate a misdemeanor theft to a felony. We need not reach this latter issue.

On August 30, 1978, pursuant to an application by police officers, a circuit judge issued a warrant for the search of the residence of the defendant in Woodford County. The search warrant stated:

"[T]he following instruments, articles and things which have been used in the commission of or which constitute evidence of the offense of Theft be seized therefrom: Any and all items of stolen railroad property such as jacks, forks, switch brooms, firearms for which no owner's identification card has been issued."

Armed with the warrant, several police officers searched the premises and seized well over 100 items. Items seized included an antique violin and a silver tea service. The search lasted approximately 3½ hours. A J.C. Penney CB transceiver, serial No. 020006, bearing a second number P300—4542—8165, was seized.

On December 5, 1978, a hearing was held on a motion filed by defendant to suppress the seized CB transceiver. Two witnesses testified on behalf of the State. Gary Poynter, a Peoria police officer, testified that on August 30, 1978, he assisted in the execution of the search warrant at the residence of the defendant. During his search of the living room area, Poynter found shovels and forks, later identified as railroad property, near a television set. The set was apparently normal looking. The picture tube was still intact. Poynter moved the television console to look behind it. He noticed that the back of the set had been removed and saw some cords dangling from it. Upon closer inspection, the officer indicated that he saw numerous CB units inside the television set. Poynter asserted that

the CB units were in plain view and that his attention had been drawn to them after he pulled the set away from the wall and noticed the cords dangling from the back of the set.

Poynter had not been told that the railroad was missing any CB radios. He knew that the CB radios did not represent railroad property. Regarding the J.C. Penney unit sought to be suppressed, Poynter noticed a number etched on the CB radio, P300—4542—8165, which he believed was a driver's license number. The number was radioed to police headquarters and it was determined to be James Petty's driver's license number. At that time the police were unable to contact Petty. A police operator was requested to locate a theft report on the unit. Poynter testified that they did not receive a theft report on the day of the search; but that on a later date they received a report which indicated that the property had been stolen. Poynter stated that the reason he looked behind the television set was to "look for the items specified in the search warrant," although he admitted that he was searching for large items of railroad-related equipment such as railroad shovels and jacks.

Poynter acknowledged that defendant was in the automotive business, automotive repair, and junk business, and stated that there were a lot of junked cars parked around defendant's property.

The second witness called by the State was David Redford, an agent for the TP&W railroad. Redford identified a type of lantern battery which was seized during the search. He stated his belief that the batteries were not made for anyone except railroads and the railroad had experienced thefts of these types of batteries. Redford testified that during the search he did not instruct the police to seize any particular property, but merely identified some of the railroad property. He did not identify any CB radios as railroad property.

At the conclusion of the hearing, the trial court denied defendant's motion to suppress. The court found that the police had a valid search warrant; that they had probable cause to believe that the CB transceiver, while not listed in the warrant, was evidence of a crime; therefore, the court held that the police had a right to seize the transceiver. We cannot agree.

■■ Initially, we note that while the question of the validity of this warrant was not raised in the defendant's motion to suppress, and is therefore not before this court, the warrant cannot be said to be clearly valid on its face. The amount of particularity required in naming the items to be seized for a given warrant to be valid will vary with the circumstances and with the ability of the complainants to be specific. (*People v. Holmes* (1974), 20 Ill. App. 3d 167, 312 N.E.2d 748.) But a minimum amount of particularity is required in all cases. In this regard, the supreme court, in *People v. Prall* (1924), 314 Ill. 518, 523, 145 N.E. 610, 612, stated:

"A minute and detailed description of the property to be seized is not required, but the property must be so definitely described that the officer making the search will not seize the wrong property. * * * [The warrant must give the officer] information by which he could select certain property within the description in the warrant and refuse to take other property equally well described in the warrant."

In this case, the warrant permitted seizure of "any and all items of stolen railroad property." Although on the record before us we cannot state exactly how specific the warrant in this case should have been, this warrant was clearly general in nature and invited the sweeping search and seizure that occurred in this case. See *People v. Gifford* (1975), 26 Ill. App. 3d 272, 325 N.E.2d 81.

The item sought to be suppressed, the CB radio, was unquestionably not an item named in the search warrant. The question becomes, what criteria must be met in order to seize an item not listed in a warrant. The central case dealing with this issue is *Coolidge v. New Hampshire* (1971), 403 U.S. 443, 29 L. Ed. 2d 564, 91 S. Ct. 2022, in which Justice Stewart, in his plurality opinion, stated that under the so-called plain-view doctrine it is sometimes permissible for police to seize items found while executing a search warrant naming other items. He noted:

"An example of the applicability of the 'plain view' doctrine is the situation in which the police have a warrant to search a given area for specified objects, and in the course of the search come across some other article of incriminating character." (403 U.S. 443, 465, 29 L. Ed. 2d 564, 582, 91 S. Ct. 2022, 2037.)

Justice Stewart then described the parameters of what may be seized under this plain-view exception. First, where there is a warrant, the police must have come upon the undescribed object during the execution of a search of permissible scope and intensity under the warrant. Three other limitations on the plain-view doctrine are stated in *Coolidge*. Those were subsequently summarized as follows: "(i) that the article seized by [*sic*] 'of incriminating character'; (ii) that it be 'immediately apparent' to the police that this is so; and (iii) that the police have 'inadvertently' come upon the evidence." 2 W. LaFave, Search & Seizure, at 166-67 (1978).

In this case it cannot be fairly said that the police happened upon the CB transceiver during a search of permissible scope and intensity. The acceptable scope and intensity of a search is determined by the search warrant, and what the search warrant lists at the place to be searched and the things to be seized. *People v. Gualandi* (1974), 21 Ill. App. 3d 992, 316 N.E.2d 195.

In the instant case, while the warrant itself is problematic, as previously discussed, Officer Poynter admitted that the items that the police

were searching for were large items of railroad property. Yet it is clear from the inventory of items seized that the police searched every nook and cranny of the house and seized countless items, large and small. None of the *listed* items were small enough to fit in back of a television set. Here the search was wholly unacceptable in its scope and intensity. The list of the items seized and the location in which those items were found make that painfully clear. Although not specifically stated by any witness, it appears from the inventory of items seized that not much was left in the house after the search, save for the furniture and·clothes belonging to the defendant and his wife.

The evidence as to the CB transceiver should have been suppressed since it fails to fulfill another requirement of the plain-view exception. It was not, and could not have been, immediately apparent to the police that the CB radio found was evidence of a crime.

Defendant was concededly a dealer in junk cars and had numerous junk cars parked around his house. Further, the house was filled with items, some of which were antiques and many were apparently salvage or junkshop items. These items cluttered the house and were located in almost every imaginable place. It is conceded also that the majority of the items seized were neither railroad property nor stolen goods, and that these were found dispersed throughout the house. It is in this factual context that one must examine the seizure of the CB radio. The radio was found in an odd location. The defendant, a dealer in junk cars who virtually used his home as a warehouse, could have come into possession of the radios without any illegality, merely in the course of his car business. The radio contained a number which appeared to be a driver's license number, and under the circumstances that would properly be a basis for an inquiry but, in light of defendant's business activity, would not support a seizure. When the police did inquire about the radio, they could neither contact Mr. Petty nor locate a theft report on it. Under those circumstances, it was not immediately apparent that the radio was evidence of a crime.

In *State v. Williams* (1978), 55 Ohio St. 2d 82, 377 N.E.2d 1013, an analogous situation was presented. In *Williams*, a warrant had been issued for the seizure of certain stolen property, specifically, a hydraulic jack, a cutting torch, and an acetylene tank. When at the garage to conduct the search, the police officers noticed that the defendant was working on a partially assembled automobile and that numerous automobile parts of the same shade were lying near the vehicle. The defendant told one police officer that the vehicle was his and that he had recently purchased it from a local salvage yard. The officer phoned the salvage yard and was informed that two automobiles were sold to the defendant in a stripped condition, missing various body parts. The

officer noted that the two cars in the shop had attached to them, or lying near them, various car parts. The officer seized the equipment listed in the search warrant, and based on the information obtained by the telephone call, seized the two cars and miscellaneous car parts. The Supreme Court of Ohio held that the officer did not have probable cause to believe, upon initial inspection of the automobile parts, that the defendant was in possession of contraband. The court noted that it was necessary for the police officer to inquire where the vehicles were purchased and place a telephone call to the salvage yard before the officer became suspicious that the parts might have been stolen. The Supreme Court of Ohio stated:

"We decline to contort the plain view doctrine so as to justify the seizure here under review, since we would thus be allowing this narrow exception to the warrant requirement to swallow the rule. Although Detective Tell, at the time of the search, harbored a generalized suspicion that the Oldsmobile body parts were stolen, his own testimony at the hearing on the motion to suppress indicated that upon mere inspection of these seemingly innocuous items it was not 'immediately apparent' that appellee was in possession of property which Tell knew, or had probable cause to believe, was contraband." 55 Ohio St. 2d 82, 86, 377 N.E.2d 1013, 1016.

In the case at bar, the sequence was reversed. The officer properly had some initial suspicion that the CB transceiver was stolen because of the driver's license number etched on it, but when the officer found no corroboration from Petty or from a police theft report, it was no longer apparent that the CB radio did not belong to the defendant. We decline, like the court in *Williams*, to contort the plain-view doctrine to encompass this situation.

Justice Stewart's concurring opinion in *Stanley v. Georgia* (1969), 394 U.S. 557, 22 L. Ed. 2d 542, 89 S. Ct. 1243, is also of some guidance in the determination of this case. In *Stanley*, a warrant provided for the seizure of things related to the illegal wagering business. While searching for such material, a motion picture film was found in a drawer. The warrant gave the agents no authority to seize the film. Although the majority opinion decided the case upon first amendment grounds, Justice Stewart concurred on the basis that the seizure of the film did not fall within the plain-view exception to the warrant requirement. He noted that the content of the film could not have been determined by mere inspection, and that it was only after 50 minutes of exhibiting the film by means of defendant's projector that the agents arrested the defendant. In concluding that the film was not lawfully seized under the fourth amendment, Justice Stewart stated:

"To condone what happened here is to invite a government official to use a seemingly precise and legal warrant only as a ticket to get into a man's home, and, once inside, to launch forth upon unconfined searches and indiscriminate seizures as if armed with all the unbridled and illegal power of a general warrant." 394 U.S. 557, 572, 22 L. Ed. 2d 542, 553, 89 S. Ct. 1243, 1251-52.

■■■ While the warrant in this case is not the precise legal document of that in *Stanley*, the police certainly used the warrant as if armed with a general warrant and searched and seized indiscriminately from defendant's home. This we cannot condone. The seizure of this evidence cannot be justified by reliance upon the plain-view doctrine.

The judgment of the circuit court denying the defendant's motion to suppress is reversed and this cause is remanded for a new trial.

Reversed and remanded.

WEBBER, J., concurs.

Mr. PRESIDING JUSTICE MILLS, dissenting:

This is a close one.

But the taproot question is this: How does this court on appeal test the trial court's action? I think the answer is clear. The standard of review for this court to apply is whether the trial court's denial of the motion to suppress was "manifestly erroneous." *People v. Conner* (1979), 78 Ill. 2d 525, 532, 401 N.E.2d 513, 516-17; *People v. Williams* (1974), 57 Ill. 2d 239, 246, 311 N.E.2d 681, 685, *cert. denied* (1974), 419 U.S. 1026, 42 L. Ed. 2d 302, 95 S. Ct. 506.

As to the facts, looking for "Any and all items of stolen railroad property such as jacks, forks, switch brooms, firearms" behind a television set in a cluttered building such as here hardly shocks my sensibilities. I consider this as classic *Coolidge*.

Evidence was *everywhere*: on floors, in the bathtub, in cars on the property, in the ceiling, in the sink, on shelves, under cabinets, under the couch, inside a doll, inside a crock, and both behind and inside the T.V. The lantern batteries, for instance, were small enough to be concealed almost anywhere and were, in fact, found in a variety of places throughout the residence. Also, some items of railroad property were found immediately adjacent to the T.V., and a weapon was found behind it.

Furthermore, I suggest that it would be highly unusual that anyone would have 15 or 16 CB units stuffed into the back of a semi-gutted television set with cords and wires dangling out of it.

To my view, this amounted to "plain view." The reasonableness of

760

police officers' conduct must be judged by the particular circumstances of the situation. Those presented by the record here satisfy me that their actions were indeed reasonable and in no way offended the mandates of *Coolidge*.

Now, as to "probable cause" to believe the items were contraband, the trial judge carefully and specifically enumerated the factors he found in this regard: the CB radios were found in an inoperative T.V. set; 15 or 16 of them was more than a run-of-the-mill homeowner would normally possess; no evidence indicated that the defendant was a dealer in citizen band radios; and there were numbers etched on the cases of the CB's "which would identify them as belonging to some other person, someone whose name began with P." The trial judge then proceeded to find "probable cause."

Did the trial judge's denial of the motion to suppress violate the standard on review? Was his action "manifestly erroneous?"

It was not.

I would affirm.

I dissent.