THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. HOWARD DONATH, Defendant-Appellant.

First District (3rd Division)   No. 1—04—0458

Opinion filed April 13, 2005.

Keith A. Spielfogel, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb and Kathryn Schierl, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE KARNEZIS delivered the opinion of the court:

Following a bench trial, defendant Howard Donath was convicted of six counts of Class X predatory criminal sexual assault (720 ILCS 5/12—14.1(a)(1) (West 2002)), six counts of Class 1 criminal sexual assault (720 ILCS 5/12—13(a)(2) (West 2002)), six counts of Class 1 child pornography (720 ILCS 5/11—20.1(a)(1)(ii), (a)(1)(iv), (a)(1)(vii) (West 2002)), eights counts of Class 2 aggravated criminal sexual abuse (720 ILCS 5/12—16(c)(1)(i) (West 2002)), and seven counts of Class 3 child

pornography (720 ILCS 5/11—20.1(a)(6), (a)(1)(ii), (a)(1)(iv), (a)(1)(vii) (West 2002)). Defendant was sentenced to a total of 100 years' imprisonment. Defendant now appeals and argues: (1) the trial court erred in denying his motion to suppress evidence; and (2) his sentence is excessive. We affirm.

## BACKGROUND

An application and affidavit for the search warrant in this case was filed on April 2, 2002, before a United States magistrate. In support of the search warrant, Special Agent (SA) Carl C. Hasler averred that he was assigned to the United States Customs Service (USCS) office and was the special agent in charge in Chicago (SAIC/Chicago). His affidavit was made in support of an application for a search warrant to search the premises located at 6614 Pinetree Street, Unit A, Hanover Park, Illinois, and any computer and computer media contained therein, for contraband and for evidence of the occupant's possession of and/or distribution of child pornography. The affidavit was based on information he gained from his personal investigation, information he received from Senior Special Agent (SSA) Jarrod L. Winkel, special agents of the Customs Cybersmuggling Center (C3), as well as from conversations with other law enforcement personnel. He further stated that the affidavit set forth only those facts that he believed established probable cause to believe that there was evidence of violations of Title 18, section 2252, of the United States Code (18 U.S.C. § 2252 (2000)) located at this address.

SA Hasler set forth the following facts in the affidavit. According to SSA Schmitz of C3, the USCS attaché in Berlin, Germany, instituted Operation Kinderschutz in 1997 as a means of identifying and investigating individuals who send and receive child pornography over the Internet. As a primary part of the operation, the German National Police (BKA) received information from law enforcement and concerned citizens who observed child pornography distributed over the Internet. After receiving this information, the BKA officers review the e-mail's "header," including the sender's name, the image file name, the date and time of the transmission and a computer name for the intended recipient. BKA officers also keep a copy of the transmission on electronic media or on print. BKA forwards all transmissions that originate in the United States to C3.

BKA forwarded information to the Berlin attaché on November 4, 2001, that child pornography had been posted under a certain screen name. The "header" information was also provided. USCS then issued subpoenas to ascertain information regarding the computer that had uploaded those images. After receiving the Internet Protocol address

for the computer, USCS issued a summons to the Internet provider seeking information about the subscriber. The Internet provider responded that the subscriber was Howard Donath. The information provided also listed a phone number and an address of 6614 Pinetree Street, Unit A, Hanover Park, Illinois, 60103. Authorities employed independent means to verify that defendant Donath did in fact live at that address.

On December 10, 2001, C3 requested evidence of the upload from BKA. C3 received the evidence on floppy disk on January 7, 2002. After reviewing the evidence, C3 found newsgroup messages containing child pornography images and forwarded this evidence on compact disk (CD) to the SAIC/Chicago on January 28, 2002.

SA Hasler averred that he personally reviewed the child pornography files uploaded on November 4, 2001, and that this upload contained 304 images of adolescent girls between the ages of 5 and 6. Seventy-three of those images showed a prepubescent girl touching her exposed genitalia, nine images depicted a prepubescent girl engaged in oral sex on an adult male, four of the images showed an adult pulling down the underpants of a prepubescent girl, one image was of a small object being placed into the vagina of a prepubescent girl and the remaining images were of naked prepubescent girls.

SA Hasler further averred that at the time of the investigation, USCS SSA Jarrod Winkel was assigned to the SAIC/Chicago. SSA Winkel had 18 years' experience with computers, computer systems, and programming and was a certified computer forensic specialist and LAN administrator for SAIC/Chicago and had been trained to perform such duties at the Federal Law Enforcement Training Center. Based on SSA Winkel's training and expertise, SA Hasler averred that computer technology has changed the production and distribution of child pornography. Computer development has significantly increased child pornographers' abilities to produce, communicate, distribute and store child pornography. SA Hasler then went on to provide specific information regarding how advances in computer technology have aided child pornographers' abilities to produce still and moving images, communicate globally, attach files, upload and download images, and transfer, edit and print images.

SA Hasler averred that a computer hard drive can store thousands of high resolution images. In addition to storing images of child pornography, computer hardware and software can store records, documents and materials, which includes information stored in any form, visual or aural, which may or may not be related to criminal activity. SA Hasler devoted two pages of the affidavit to detailing the search and seizure of a computer system. Much of this section focused on the

difficulty in searching a computer at the place where it is recovered due to the need for an extensive search. Because computer evidence is very vulnerable to intentional or unintentional modification, a controlled environment is necessary to protect the integrity of the evidence contained therein. In addition, in order to fully retrieve data from a computer system, the entire computer system, including all storage devices, was needed. Many computer storage devices are small and may be located throughout the house.

Based on all of this information, SA Hasler averred that there was probable cause to believe that there was evidence, fruits and instrumentalities of trafficking, receipt and distribution of child pornography in violation of Title 18 of the United States Code located at defendant's residence. Specifically, such evidence included:

"a. Tapes, cassettes, cartridges, streaming tape, commercial software and hardware, computer disks, disk drives, monitors, computer printers, modems, tape drives, disk application programs, data disks, system disk operating systems, magnetic medial floppy disks, hardware and software operating manuals, tape systems and hard drive and other computer related operation equipment, digital cameras, scanners in addition to computer photographs, Graphic Interchange formats and/or photographs, undeveloped photographic film, slides, and other visual deceptions of such Graphic Interchange formats (including but not limited to JPG, GIF, TIF, AVI, and MPEG), and the date within the aforementioned objects relating to said materials, which may be, or are, used to: visually depict child pornography or child erotica, contain information pertaining to an interest in child pornography, or sexual activity with children; and/or distribute, receive, or possess child pornography, child erotica or information pertaining to an interest in child pornography, child erotica or information pertaining to an interest in child pornography or child erotica.

\* \* \*

e. Originals, copies and negatives of visual depictions of minors engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256.

f. Motion picture films and video cassettes of visual depictions of minors engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256.

\* \* \*

n. Diaries, notebooks, notes and other records reflecting personal contact and other activities with minors visually depicted while engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256."

On April 2, 2002, the United States magistrate issued a search

warrant for the search of defendant's residence on Pinetree Street based on SA Hasler's application and affidavit for a search warrant. The warrant authorized the search and seizure of the items listed in the application and affidavit for the search warrant.

On April 4, 2002, federal and local authorities searched defendant's Pinetree Street residence pursuant to the warrant obtained from the United States magistrate. Among the items seized from defendant's residence were 25 eight-millimeter tapes.

As a result of the search of defendant's residence, defendant was charged in a 74-count indictment. The State proceeded on 34 of the 74 initial crimes charged. Defendant was prosecuted for six counts of Class X predatory criminal sexual assault (720 ILCS 5/12—14.1(a)(1) (West 2002)), six counts of Class 1 criminal sexual assault (720 ILCS 5/12—13(a)(2) (West 2002)), six counts of Class 1 child pornography (720 ILCS 5/11—20.1(a)(1)(ii), (a)(1)(iv), (a)(1)(vii) (West 2002)), eights counts of Class 2 aggravated criminal sexual abuse (720 ILCS 5/12—16(c)(1)(i) (West 2002)), and seven counts of Class 3 child pornography (720 ILCS 5/11—20.1(a)(6), (a)(1)(ii), (a)(1)(iv), (a)(1)(vii) (West 2002).

Prior to trial, the defense filed a motion to suppress evidence seized from defendant's home pursuant to the April 2, 2002, search warrant. In the motion, defendant argued that the search warrant lacked probable cause and that the search was overbroad. Following arguments on the motion, the trial court denied defendant's motion to suppress evidence.

At trial, L.G. testified that her birth date was February 6, 1990, and at the time of trial in October 2003, she was 13 years old. From 1998 to 2002, she lived at 6614 Pinetree Street, Unit D, Hanover Park, Illinois, in the same complex as defendant. She did not know defendant before she moved into Unit D. L.G. identified defendant in open court.

L.G. stated that from 1998 through 2002, there were times when she was alone in defendant's apartment. During this time period, defendant photographed her and took videos of her. L.G. testified that the day before trial, she went to the State's Attorney's office and viewed photographs and a video. She testified that she believed that she was between 7 and 11 years of age in the photographs.

Detective John Dossey of the Hanover Park police department testified that on April 4, 2002, he was a Hanover Park police officer and assisted USCS agents in executing a search warrant at defendant's residence located at 6614 Pinetree Street, Unit A. Detective Dossey identified photographs and a bathing suit that were recovered from one of the bedrooms in defendant's home. One of the photographs showed a young girl in an explicit position. Detective Dossey did not know the identity of the girl in the photographs at the time, but a later investigation revealed that the girl was L.G.

SSA Izuni Therrien testified that she was employed by Immigration and Customs Enforcement. On April 4, 2002, SSA Therrien was assigned to the Trade Fraud Child Pornography Group of USCS. SSA Therrien assisted in the execution of the search warrant at defendant's Pinetree Street residence on April 4, 2002. SSA Therrien identified a bathing suit that was seized from defendant's residence. She also identified an eight-millimeter videotape, People's Exhibit 26, that she found during the search of defendant's home. SSA Therrien testified that she recognized the tape because it was not in a case, it had a label on it with the letters MT and it contained a serial number. These markings were on the tape when she recovered it. SSA Therrien located the tape in a closet in the living room of defendant's residence. The tape was in a box covered by other items. At the time the tape was seized, SSA Therrien did not know what the tape contained. SSA Therrien first viewed the tape on April 7, 2002. The tape, People's Exhibit 26, was published to the court over objection by the defense. A transcript of the audio portion of the tape was also entered into evidence. The tape showed defendant engaging in sexual conduct with L.G. After publication of the tape, SSA Therrien testified that she recognized the man in the video as defendant.

On cross-examination SSA Therrien testified that during the course of the search of defendant's residence, approximately 25 eight-millimeter tapes were recovered. SSA Therrien viewed approximately 9 of the tapes in her office and took approximately 16 tapes with her and viewed them at her home, which was standard procedure if it appeared that a victim was involved.

The parties entered into a stipulation that defendant was born on December 28, 1951. The parties also stipulated that in April 2002, L.G. underwent a medical examination at the Northwest Cook County Medical Clinic. L.G.'s hymen and rectal examination revealed normal findings. It was further stipulated that normal results do not rule out sexual abuse.

After hearing all of the evidence, the trial court found defendant guilty of all counts and sentenced him to 100 years' imprisonment.

## ANALYSIS

Defendant now appeals from the denial of his motion to suppress evidence. The issue before us is whether uploading child pornography on one occasion, five months prior to obtaining a warrant, provides probable cause for that warrant.

■ Whether probable cause exists to support a search warrant depends upon whether the totality of the circumstances and facts known to the affiant was sufficient to warrant a person of reasonable

caution to believe that the law was violated and that evidence of the violation would be on the premises to be searched. *People v. Beck*, 306 Ill. App. 3d 172, 177-78, 713 N.E.2d 596, 600-01 (1999). See also *Illinois v. Gates*, 462 U.S. 213, 238, 76 L. Ed. 2d 527, 548, 103 S. Ct. 2317, 2332 (1983) (a magistrate must determine that there is a fair probability that evidence of criminal activity will be found in a particular place). The standard for determining the existence of probable cause is the probability of criminal activity, rather than proof beyond a reasonable doubt. *Beck*, 306 Ill. App. 3d at 178, 713 N.E.2d at 600-01. When reviewing a trial court's decision regarding a motion to suppress evidence, we must accord great deference to the trial court's factual findings and will reverse those findings only if they are against the manifest weight of the evidence. *People v. Sorenson*, 196 Ill. 2d 425, 431, 752 N.E.2d 1078, 1083 (2001). However, our review is *de novo* where, as here, the question is one of law. *People v. Gonzalez*, 204 Ill. 2d 220, 223, 789 N.E.2d 260, 263 (2003).

■ A warrant is stale when too much time has elapsed between the facts alleged in the affidavit in support of the search warrant and the issuance of the warrant. *Beck*, 306 Ill. App. 3d at 179, 713 N.E.2d at 601-02. There does not exist, however, an arbitrary cutoff period expressed in days or weeks beyond which probable cause ceases to exist. *People v. Thompkins*, 121 Ill. 2d 401, 435, 521 N.E.2d 38, 52 (1988). The absence of such a rigid rule allows a magistrate to exercise his informed judgment. *Thompkins*, 121 Ill. 2d at 435, 521 N.E.2d at 52, citing *United States v. Beltempo*, 675 F.2d 472, 478 (2d Cir. 1982).

■ Defendant correctly asserts that Illinois courts have found that the single most important factor in determining whether probable cause exists is whether the defendant has engaged in a continuing course of criminal conduct. *People v. Hancock*, 301 Ill. App. 3d 786, 793, 704 N.E.2d 431, 436 (1998). However, the absence of a continuing course of conduct is not fatal to the finding of probable cause. Indeed, our supreme court has recognized other factors to be considered when the inquiry with respect to probable cause involves an isolated incident:

> " '[These factors] include the nature of the object sought, its location on the premises and the state in which it was observed. The nature of the object would encompass such considerations as whether it is large or small, moveable or fixed, disposable or permanent and innocuous or incriminating. The location of an object on the premises would involve, for example, whether it was in plain sight on a table, locked in a safe, on a beam in a cellar or secreted behind a bricked-in wall. The state in which the object was seen is especially important today because modern technology

and equipment have the sophisticated capacity to ascertain whether matter—in whatever form it may be—is present or even may have once been present. \*\*\* The inquiry with respect to probable cause in the case of an observation of an isolated incident should focus on all of the relevant circumstances, including the element of time lapse, to determine the probability of the continued existence of the object sought at the place where it was last seen. The overall approach should be one of flexibility and common sense.' " *Thompkins,* 121 Ill. 2d at 435-36, 521 N.E.2d at 52, quoting *Beltempo,* 675 F.2d at 478.

■ Defendant argues here that the single act of uploading 304 child pornographic photographs does not constitute a continuing course of conduct on which probable cause for a search warrant could be properly based. In support, defendant relies on *United States v. Zimmerman,* 277 F.3d 426 (3d Cir. 2002).

In *Zimmerman,* the police department in McCandless Township, Pennsylvania, obtained a search warrant to search the residence of the defendant for adult and child pornography. The warrant application contained information that, many months earlier, the defendant possessed or accessed via the Internet one video clip of adult pornography and showed it to a high school student. The warrant did not contain any information that the defendant ever possessed child pornography or that child pornography would be found in his home. *Zimmerman,* 277 F.3d at 429. The defendant's home was searched on March 19, 1999, and several images of child pornography were found.

Prior to trial, the defendant's motion to suppress evidence was denied. The defendant sought review of that order on appeal. The Third Circuit Court of Appeals found there was no probable cause to search the defendant's residence for child pornography. *Zimmerman,* 277 F.3d at 432.

Defendant contends that the facts of the instant case are similar to *Zimmerman* in that both cases involve a search warrant premised on a single act, rather than a continuing course of conduct. In addition, defendant maintains that similar to *Zimmerman,* there was a lapse in time between the incident that formed the basis of the warrant and the actual issuing and execution of the search warrant. Therefore, defendant urges us to follow the holding in *Zimmerman* to find that the search warrant in his case lacked probable cause.

Contrary to defendant's assertions, the *Zimmerman* court found that the police lacked probable cause to search the defendant's residence because the police "intended to enter Zimmerman's home to retrieve *child* pornography, although there was absolutely no information in the affidavit or anywhere else indicating that child pornography

was—or ever had been—located there." (Emphasis in original.) *Zimmerman*, 277 F.3d at 433. In addition, the court found that the video clip of adult pornography, the only pornography that officers were aware of, was legal. Furthermore, the *Zimmerman* court recognized that collectors of child pornography store such images for long periods of time, in a secure place, generally their homes, and rarely dispose of it because it is illegal and difficult to obtain. *Zimmerman*, 277 F.3d at 434. Unlike child pornography, the adult pornography that the officers were aware of in *Zimmerman* "may well have been located in cyberspace, not in Zimmerman's home," because it was legal and easy to obtain. *Zimmerman*, 277 F.3d at 435. Consequently, we find defendant's reliance on *Zimmerman* to be misplaced.

Defendant also contends that the affidavit in support of the search warrant in this case failed to establish probable cause because it alleged, but failed to establish, that defendant was a collector of child pornography. In support, defendant relies on *United States v. Weber*, 923 F.2d 1338 (9th Cir. 1990).

In *Weber*, an affidavit submitted by a customs agent in support of a search warrant contained the "expert" testimony of a Los Angeles police detective who had experience with, and training in, child pornography investigations. The detective averred in a portion of the affidavit that he possessed knowledge of three kinds of suspects: "child molesters," "pedophiles," and "child pornography collectors." He further stated that he believed a pedophile "typically" uses sexually explicit materials to show children in order to lower their inhibitions so that the pedophile may molest them. He also stated that pedophiles "often" take photographs of their victims and develop the pictures using their own developing equipment. The detective further opined that "pedophiles and/or child pornography collectors" retain photographs for "many years" and rarely destroy them and that these types of materials are kept in the person's residence or other secure convenient location so that they are readily accessible. *Weber*, 923 F.2d at 1341.

The Ninth Circuit found that other than one order of child pornography photos placed by the defendant, there was nothing in the affidavit for the warrant to support probable cause to search for items other than the photos delivered as a result of that order. *Weber*, 923 F.2d at 1344. The *Weber* court found the "expert" testimony of the detective to be foundationless. The court noted that nowhere in the affidavit was it indicated that the defendant's interest in, or possession of, one order of photographs of child pornography placed him in the category of a pedophile, molester or child pornography collector. The court found that the affidavit lacked the specificity needed to determine, for example, how many magazines or pictures one must

purchase in order to be considered a collector. *Weber*, 923 F.2d at 1345. Furthermore, the court also determined that the affidavit was not drafted with the facts of the case or the particular defendant in mind. *Weber*, 923 F.2d 1345.

We find *Weber* distinguishable. Unlike *Weber*, there was evidence from which it could be concluded that defendant possessed child pornography in his home shortly before the warrant was executed. Defendant uploaded 304 images of child pornography from his home computer. While there is no bright-line rule with respect to how many images one must possess to be considered a collector, we are confident that the amount of images uploaded in this case indicates that defendant was a collector of such images, especially given the fact that defendant uploaded these images as opposed to downloading them. The difference between uploading and downloading images is significant in this case. Downloading is "pick[ing] up" a file, program or photograph from another computer and bringing it "down" to your computer. An upload is the opposite. Uploading is sending something from your computer "up" to someone else's computer. See www.foundhost.com/article.php/1/168. Because defendant uploaded and distributed the images, it is reasonable to infer that defendant possessed them somewhere in his home, either on his computer or some electronic media storage. Furthermore, there was expert testimony in the affidavit which addressed the facts of the defendant's case and concluded that based on the upload of 304 images of child pornography, defendant was a collector of child pornography.

The State likens the facts of the instant case to those of *United States v. Hay*, 231 F.3d 630 (9th Cir. 2000). In *Hay*, the trial court denied the defendant's motion to suppress evidence seized from his home. The defendant appealed the denial relying on *Weber* and argued that the "search of his entire computer system based on a seven-minute, six month old transmission of 19 images of child pornography was unreasonable." *Hay*, 231 F.3d at 632.

The facts of the investigation that led to the issuance of the warrant to search the defendant's home were as follows: An arrest of a known trafficker in child pornography and a search of his computer system revealed that he had transmitted 19 child pornography images from his computer to a computer that was affiliated with a university, but was assigned to and associated with a network port wired to the defendant's apartment. *Hay*, 231 F.3d 632. A telephone call placed to the defendant by an undercover agent revealed that the defendant did own a computer which he kept in his apartment and that the computer was affiliated with the university but that he was the only user of this computer. *Hay*, 231 F.3d at 633.

In an affidavit in support of a search warrant, the investigating agent averred that the images transmitted from the known child pornography trafficker to defendant's computer were likely to be found in the defendant's computer based on information that collectors and traders of child pornography retain those images. *Hay*, 231 F.3d at 633. A warrant was issued by a United States magistrate to search the defendant's apartment and to seize his computer hardware, software, documents, material and record as well as any images of child pornography. *Hay*, 231 F.3d at 633. The defendant's computer, software, and disks were seized as well as videotapes. *Hay*, 231 F.3d at 633.

Similar to defendant here, the defendant in *Hay* relied on *Weber* and argued that probable cause was lacking because there was no evidence of a pattern of criminal activity. *Hay*, 231 F.3d at 633. The *Hay* court rejected the defendant's argument.

"[The] affidavit is quite different from the affidavit we faulted in *Weber*. It contains a good deal of evidence from which the magistrate judge could conclude that the 19 files transmitted via FTP to Hay's Internet address would be found on Hay's computer system. [The known pornography trader's computer] log contained separate entries for each of the 19 file transfers and the transfers occurred at different times over a seven-minute period. *** [The files] did not go to Hay's e-mail address [citation] but to his Internet address *** via FTP. FTP is a protocol for the direct transfer of files and has nothing to do with e-mail. *** [The] affidavit also recites information obtained from the University's records indicating that the computer located in Hay's apartment is sometimes configured to use the specific Internet address to which [the files] were transmitted, and from Hay himself that he is the exclusive user of the computer in his apartment." *Hay*, 231 F.3d at 634.

We reject defendant's argument in the case at bar for similar reasons. There was evidence from which the magistrate judge could conclude that the 304 images defendant uploaded would be found on his computer. Unlike *Hay*, defendant here distributed rather than received child pornography. Distributing, rather than receiving, child pornography lends stronger support to the inference that the child pornography would be found on defendant's computer. Defendant had to possess the images in order to distribute them. Furthermore, the images were uploaded from defendant's computer. After receiving the Internet Protocol address for the computer, USCS issued a summons to the Internet provider seeking information about the subscriber. The Internet provider responded that the subscriber was Howard Donath. The information provided also listed a phone number and an address of 6614 Pinetree Street, Unit A, Hanover Park, Illinois, 60103.

"[P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Gates*, 462 U.S. at 243 n.13, 76 L. Ed. 2d at 552 n.13, 103 S. Ct. at 2335 n.13. The information in the affidavit and application for a search warrant in the case *sub judice* was sufficient to establish a probability of criminal activity. Consequently, the trial court properly denied defendant's motion to suppress evidence.

Defendant argues that, assuming *arguendo* the affidavit provides probable cause to search defendant's computer, the warrant sought items as to which probable cause did not exist. Defendant asserts that "a simple reading of the items authorized for seizure in the warrant reveals it called for a blanket search of the home without any meaningful particularity."

The United States and Illinois Constitutions (U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6) require that a search warrant describe with particularity the place to be searched as well as the property to be seized. It is not necessary to give a "minute and detailed" description of the property to be seized, but " 'the property must be so definitely described that the officer making the search will not seize the wrong property.' " *People v. Batac*, 259 Ill. App. 3d 415, 420, 631 N.E.2d 373, 376 (1994), quoting *People v. Prall*, 314 Ill. 518, 523, 145 N.E.2d 610, 612 (1924). Essentially, the warrant should provide the executing officer with sufficient information "by which he could select certain property within the description in the warrant and refuse to take other property equally well described in the warrant." *Prall*, 314 Ill. at 523, 145 N.E.2d at 612.

The crux of defendant's argument centers around the seizure of the eight-millimeter tape, People's Exhibit 26, which was published at trial. Defendant asserts that given the location where the tape was found, the warrant could not have contemplated the seizure of the tape. Defendant claims that similar to the case of *People v. Harmon*, 90 Ill. App. 3d 753, 413 N.E.2d 467 (1980), the warrant did not authorize the seizure of that item.

In *Harmon*, a search warrant authorized the search and seizure of " '[t]he following instruments, articles and things which have been used in the commission of or which constitute evidence of the offense of Theft be seized therefrom: Any and all items of stolen railroad property such as jacks, forks, switch brooms, firearms for which no owner's identification card has been issued.' " *Harmon*, 90 Ill. App. 3d at 754, 413 N.E.2d at 469. The premises were searched and officers seized over 100 items, including CB units secreted inside a television set. The defendant sought to suppress the CB radio on the grounds that it was not named in the search warrant. On review, this court

framed the issue as "what criteria must be met in order to seize an item not listed in a warrant." *Harmon*, 90 Ill. App. 3d at 756, 413 N.E.2d at 469.

Clearly, the issue addressed by the *Harmon* court is distinguishable from the issue in the case at bar and therefore *Harmon* does not support defendant's particularity argument. As previously mentioned, the warrant in this case allowed for the seizure of "[m]otion picture films and video cassettes of visual depictions of minors engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256." SA Therrien located the eight-millimeter tape in a box in defendant's closet, in a place where electronic media containing child pornography would likely be found. Consequently, the seizure of the tape was not unreasonable.

Defendant takes his argument one step further and asserts that the eight-millimeter tape was outside the scope of the warrant because it was not readily apparent that it contained visual depictions of minors engaged in sexually explicit conduct. At the time the tape was seized, SA Therrien did not know whether the tape contained pornographic material, child or adult. The contents of the tape were revealed three days later when SA Therrien reviewed the tapes at her home and office. We reject this argument.

Courts have upheld off-site examination of computer equipment seized pursuant to a search warrant for evidence of criminal activity. See *Hay*, 231 F.3d at 637; *United States v. Lacy*, 119 F.3d 742, 746-47 (9th Cir. 1997); *United States v. Upham*, 168 F.3d 532, 536 (1st Cir. 1999). In *Lacy* the off-site examination of the defendant's computer to search for contraband was justified because of the time, expertise and controlled environment needed for a proper analysis. *Lacy*, 119 F.3d at 476-77. Similarly, the off-site viewing of the eight-millimeter videotape was justified in this case. It is evident to any reasonable person that one cannot ascertain the contents of a video or aural tape without viewing or listening to the tape. Given the nature of this case and the fact that 25 eight-millimeter tapes were seized from defendant's home, time constraints would prevent the viewing of all of the tapes on-site. Accordingly, the eight-millimeter tape in question here was properly seized pursuant to the warrant and the off-site viewing of the tape to ascertain its contents was proper and clearly contemplated by the warrant.

■ Finally, defendant claims that his 100-year sentence is excessive. The State presented the testimony of four witnesses at sentencing. SA Hasler testified that when the search warrant was executed, defendant was present. SA Hasler informed defendant that the search warrant was for child pornography. SA Hasler and defendant then had

a conversation in defendant's kitchen for which SSA Winkel was present. Defendant told SA Hasler that if they examined his computers in his house and related media they would find images of child pornography. Defendant also told SA Hasler and SSA Winkel that he preferred females between the ages of 8 and 12.

SSA Winkel also testified at sentencing. SSA Winkel was present when the search warrant was executed at defendant's residence. SSA Winkel assisted SA Hasler in interviewing defendant. SSA Winkel was also present to conduct a forensic analysis of the equipment seized from defendant's residence. Five computers, seven hard drives, 402 floppy disks, and 376 computer compact disks and other media were seized from defendant's home. A scanner, image enhancement or negative enhancement machine, cameras and a video camera were also seized.

SSA Winkel began a forensic examination of the computer equipment seized from defendant's home on April 5, 2002. SSA Winkel found 224,376 images and video of child pornography on the computer hard drives and related media. SSA Winkel had been involved with 150 forensic examinations for child pornography but had never seen a case involving such an enormous amount of images. SSA Winkel recovered images of L.G., the victim in this case. SSA Winkel created 84 computer compact disks that contained the child pornography images that were found on defendant's equipment. Those computer compact disks were forwarded to the State's Attorney's office. SSA Winkel also testified that during an unrelated investigation, he discovered that defendant had distributed pornographic images of L.G.

SA Therrien testified at sentencing. She was present at the time the search warrant was executed in defendant's home. SA Therrien identified some of the photos, including a photo of L.G. and her sister S.G., that were recovered from defendant's residence during the execution of the warrant.

Finally, Assistant State's Attorney (ASA) Kathleen Muldoon testified. In April 2002, she was assigned to the child advocacy and protection unit of the sex crimes division. On April 22, 2002, ASA Muldoon had a conversation with L.G. wherein L.G. related that she knew defendant as her neighbor, that defendant had touched her vaginal area and had forced her to touch his penis.

During her investigation in an unrelated case, ASA Muldoon reviewed the 84 computer compact disks created as a result of SSA Winkel's forensic examination of defendant's computer and media. ASA Muldoon then identified a group of 35 images that she had printed out from the 84 computer compact disks she had viewed. The 35 images were a "sample" of the child pornography images she had

viewed. As a result of viewing those images, ASA Muldoon sought a separate indictment for manufacturing and distributing child pornography.

Defendant did not present any evidence in mitigation but did make a statement in allocution.

The trial court has broad discretionary powers in choosing the appropriate sentence a defendant should receive. *People v. Jones*, 168 Ill. 2d 367, 373, 659 N.E.2d 1303, 1309 (1995). A reasoned judgment as to the proper sentence to be imposed must be based upon the particular circumstances of each individual case and depends upon many factors, including the defendant's credibility, demeanor, general moral character, mentality, social environment, habits and age. *People v. Perruquet*, 68 Ill. 2d 149, 154, 368 N.E.2d 882, 883 (1977). The trial court has discretion in imposing a sentence and a reviewing court has the power to disturb the sentence only if the trial court abused its discretion. *Jones*, 168 Ill. 2d at 373-74, 659 N.E.2d at 1308.

The defendant's history, character, rehabilitative potential, the seriousness of the offense, the need to protect society and the need for deterrence and punishment are all factors to be considered in fashioning a sentence. *People v. Jones*, 295 Ill. App. 3d 444, 455, 692 N.E.2d 762, 770 (1998). There is a strong presumption that the trial court based its sentencing determination on proper legal reasoning, and the court is presumed to have considered any evidence in mitigation which is before it. *People v. Partin*, 156 Ill. App. 3d 365, 373, 509 N.E.2d 662, 666-67 (1987). However, the trial court need not give "greater weight to the possibility of rehabilitation than to the seriousness of the offense." *Partin*, 156 Ill. App. 3d at 373, 509 N.E.2d at 666.

As previously stated, defendant was sentenced to a total of 100 years' imprisonment. The trial court found beyond a reasonable doubt that defendant committed predatory sexual assault, a Class X felony, against a person under the age of 12 (720 ILCS 5/12—14.1 (West 2002)) and therefore found that defendant was eligible for extended-term sentencing and consecutive sentencing. 730 ILCS 5/5—5—3.2(b)(4)(i), 5—8—2(a)(2), 5—8—4(a) (West 2002). Consequently, the court sentenced defendant to 30 years' imprisonment for each of three counts of predatory criminal sexual assault (720 ILCS 5/12—14.1 (a)(1) (West 2002)) and 10 years' imprisonment for child pornography (720 ILCS 5/11—20.1(a)(1) (West 2002)), all sentences to run consecutively.

The trial court did not abuse its discretion in imposing sentence in this case. The record reveals that the court reviewed its "notes in the case, the notes of the sentencing hearing, the presentence investigation and the statutory factors in aggravation and mitigation, as well as

taking in the arguments of counsel and the defendant's statement of elocution [*sic*]." Taking all of that into consideration the court found "no factors in mitigation in this case" but found "multiple factors in aggravation." The trial court was well within its discretion when it imposed the sentence. We find no abuse of discretion here.

Accordingly, the judgment of the trial court is affirmed.

Affirmed.

HOFFMAN and SOUTH, JJ., concur.