2020 IL App (2d) 190702-U
No. 2-19-0702
Order filed September 22, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lee County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 17-CF-67 |
| WILLIE M. RANDLE, | ) ) | Honorable Jacquelyn D. Ackert, |
| Defendant-Appellee. | ) | Judge, Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justices Schostok and Hudson concurred in the judgment.

**ORDER**

¶ 1    *Held*: Probable cause existed for placing an electronic tracking device on defendant's vehicle in March 2017; information from confidential informants that defendant was involved in drug trafficking as part of the Satan Disciples in the previous three years and as recently as November 2016, together with defendant's prior drug convictions, supported a reasonable inference that defendant was continuing his criminal activity into March 2017.

¶ 2    The State appeals from the judgment of the circuit court of Lee County granting defendant, Willie M. Randle's, motion to quash a search warrant and suppress evidence. We reverse and remand because the totality of the facts and circumstances contained in the sworn complaint for a search warrant, along with the reasonable inferences drawn therefrom, provided a substantial basis

for the issuing magistrate to find probable cause to believe that defendant was engaged in a continuing course of criminal conduct.

¶ 3                                                    I. BACKGROUND

¶ 4                                            A. Warrant and Arrest

¶ 5      On March 8, 2017, Sterling police detective Michael Henry filed a sworn complaint for a search warrant to install, monitor, maintain, and remove an electronic tracking device on a 2015 Dodge Ram belonging to defendant. A Whiteside County judge issued the warrant. The judge found that the complaint "states facts sufficient to show probable cause that the installation, monitoring, maintenance, and removal of an ELECTRONIC TRACKING DEVICE will produce evidence of violations of the Illinois Controlled Substances Act and/or Cannabis Control Act."

¶ 6      On March 15, 2017, Henry located the vehicle and installed the tracking device. Thereafter, Henry was alerted to the following movements via electronic tracking device software.[1] On March 17, 2017, defendant traveled via Interstate 88 to the area of 8460 South Lafayette Avenue in Chicago, arriving at 11:04 a.m. On March 23, 2017, defendant traveled from his residence to fellow gang member Douglas L. Medina's residence. On March 27, 2017, defendant again traveled via Interstate 88 to the area of 8460 South Lafayette Avenue in Chicago, arriving at 10:51 a.m. On that day, Henry positioned himself at the Rochelle exit and waited for defendant's return; other officers, along with a K-9, were located nearby. At 1:17 p.m., officers conducted a traffic stop of defendant's vehicle. Two to three minutes later, a sheriff's deputy arrived and deployed his K-9 to conduct a free air sniff around the vehicle. The K-9 "alerted" on the driver's side of the vehicle. A

_____

[1] The facts concerning what transpired after Henry installed the tracking device were taken from the State's response to defendant's motion to quash the warrant and suppress evidence.

search of the vehicle revealed 250 grams of powder cocaine packaged into two separate baggies. Defendant subsequently admitted to acquiring the cocaine near Chicago and stated that there should be two baggies containing 4.5 ounces each. When asked if the two baggies were going to Medina's house for distribution to gang members, defendant said that he did not wish to talk about what occurred within the gang, but stated, " 'Sounds like you already know what's going on.' "

¶ 7    Defendant was charged with one count each of unlawful possession with intent to deliver 100 grams or more but less than 400 grams of a substance containing cocaine (720 ILCS 570/401(a)(2)(B) (West 2016)) and unlawful possession of 100 grams or more but less than 400 grams of a substance containing cocaine (720 ILCS 570/402(a)(1)(B) (West 2016)).

¶ 8    B. Hearing on Defendant's Motion to Quash Search Warrant and Suppress Evidence

¶ 9    On September 18, 2018, defendant filed a "Motion to Quash Search Warrant and Suppress Evidence Seized as a Result Thereof or in the Alternative Motion for *Franks* Hearing." A hearing took place on May 13, 2019, at which the parties agreed to proceed "on the four corners" of the complaint for a search warrant and reserve the remaining issues for another hearing date.

¶ 10           1. Overview of the Six-Page Complaint for a Search Warrant

¶ 11                      a. Detective Henry

¶ 12    Henry averred that he had over 10 years' experience as a police officer and was assigned to the Blackhawk Area Task Force. He had "participated in electronic surveillance and other surveillance techniques, drug-related investigations, the use of informants, utilization of overhear devices, as well as undercover operations." He averred that "[t]hrough information obtained from [his] own involvement in this investigation, [he] has determined that it is necessary for an ELECTRONIC TRACKING DEVICE to be utilized because there is a lack of necessary manpower and covert vehicles to adequately support a constant surveillance operation taking place

over multiple days" and that "there exists a high probability that the target of the investigation *** will detect any covert surveillance." He further averred that individuals who traffic "illegal substances make frequent, short stops at different locations," which makes surveillance difficult "without utilizing an electronic tracking device."

¶ 13                    b. Information Obtained from Confidential Informant Smith

¶ 14    Henry averred that, on April 26, 2016, he and another detective spoke with a confidential source, who used the fictitious name " 'Jorden Smith' " (Smith). Smith had "firsthand knowledge of the local Satan Disciples street gang members and operation due to a relationship with one of the gang members." Smith had "purchased cocaine several times from many of the *** gang members, including [defendant]." Smith identified defendant from a photo array and provided the most recent telephone number that she had for defendant. Smith "reported purchasing cocaine from [defendant] approximately thirty to forty times over the last year to year and a half." Smith advised that defendant "drove a dark colored Range Rover type sport utility vehicle and lived at 209 6th Avenue, Sterling." "In the past, 'Smith' had provided [defendant] a ride to *** Chicago for the purposes of [defendant] purchasing several ounces of powder cocaine." On one occasion, defendant directed Smith to a Walgreens in Cicero, where defendant exited the vehicle, met with a black male, and returned to the vehicle with a brown bag. Defendant showed Smith "the contents of the bag which appeared to be several ounces of powder cocaine." Smith was familiar with the appearance of cocaine from previous use. Defendant stored the cocaine at his residence. Smith knew that defendant had a "construction job." Henry averred that Sterling police officers knew that defendant worked at Sterling Commercial Roofing and had observed defendant's Range Rover parked in the parking lot. Henry further averred that defendant was currently laid off for the winter.

¶ 15    According to Henry, "[o]n May 16, 2016, 'Smith' had a Facebook messenger conversation with [defendant] for the purpose of arranging a drug transaction." Henry viewed the Facebook profile and saw that the photo associated with the profile was of defendant. The conversation proceeded as follows:

> "SMITH: what's good in the hood playa?
>
> SMITH: its been a min. you n your girl look super happy! Shes
>
> SMITH: pretty*
>
> DEFENDANT: I see u got a Man now. I'm been good I thought about getting a hold of u
>
> SMITH: yeah it's been a while I was gonna holla at you but didn't know if your lady would get mad. you seem happy that's
>
> SMITH: what's up
>
> DEFENDANT: Yea u still live in Sterling
>
> SMITH: i been looking for somethin though was seein what's up if you good on anything. everyone else still shady to me n shit aint fire
>
> SMITH: naw im back in Dixon hby?
>
> SMITH: still at the same spot?
>
> DEFENDANT: Yea same spot. I might but do I have to
>
> SMITH: do you have to what
>
> SMITH: ?
>
> DEFENDANT: You no how we do it
>
> SMITH: you gotta girl now I thought!
>
> DEFENDANT: I'm just saying

SMITH: I gotta boyfriend now too actually lol but you know I got money however much. I aint been fuckin around and been working my ass off

DEFENDANT: What u trying to do

SMITH: a few"

According to Henry, the drug transaction did not occur, because defendant wanted "to trade drugs for sex." Henry further averred that Smith has cooperated with Sterling for purposes of conducting controlled purchases while wearing an eavesdropping device. " 'Smith' has communicated with [defendant] and other Satan Disciple gang members *** and has captured incriminating conversations which corroborate previously obtained intelligence."[2]

¶ 16          c. Information Obtained from Confidential Informant Davis

¶ 17    Henry averred that, on August 24, 2016, he spoke with confidential informant " 'Shane Davis' " (Davis). Davis told Henry that he could purchase cocaine from various Satan Disciple gang members. According to Henry:

" 'Davis' has provided information about the Satan Disciples street gang and their drug operations. The same information has been reported to investigators in the past by other sources, and there is extensive historical drug information involving several of the Satan Disciples street gang members mentioned to investigators by 'Davis,' including [defendant], Lewis F. Vaughn ***, and Douglas L. Medina."

---

[2] Defendant argues that this statement was "not true" because "[d]iscovery requests revealed that there is no recording of any conversation between Smith and Defendant." We note, however, that Henry's statement makes no claim that the police captured any conversations with defendant.

¶ 18    Davis knew that Vaughn sold cocaine to multiple people in the area and that a "higher ranking Satan Disciple" gang member, Manuel E. Espinosa, used to provide cocaine to Vaughn to sell. Davis reported that Vaughn used to make arrangements with Espinosa every couple of weeks to obtain more cocaine to sell. Davis told Henry that he

> "has received drugs from 'Vaughn' on a 'front' several times, ranging in amounts from one-quarter to one-half ounce of cocaine. A 'front' is when someone provides drugs for sale to another person with no money being exchanged and with the understanding that money will be provided to the dealer once the drugs have been sold."

Henry averred that, "based upon intelligence information," he learned about a "division" that had occurred within the gang. Gang members were upset that Espinosa was taking too long to obtain cocaine for them to sell. "Espinosa began to lose followers to Medina." Espinosa and Medina began feuding over money and drugs. According to Henry, Espinosa was in jail on gun and drug-related charges, "causing Vaughn to either sell for Medina or find his own supply source."

¶ 19    Henry averred that, on September 19, 2016, Davis cooperated in a controlled purchase from Vaughn. Vaughn gave Davis 15 grams of cocaine to sell with the agreement that Davis would pay him $400 at a later date. Following the transaction, which occurred inside Vaughn's home, Davis gave Henry a knotted baggie containing 15 grams of cocaine. On September 26, 2016, Davis made a controlled payment of $400 to Vaughn using prerecorded funds. The conversations between Davis and Vaughn were recorded under a state-court-authorized eavesdropping order. Following the payment, surveillance officers followed Vaughn to Medina's residence.

¶ 20    Henry further averred that, "[o]n November 1, 2016, 'Davis' had an in-person conversation with Medina.

"Medina reported to 'Davis' that Vaughn had been coming over to [Medina's residence] about twice a week to obtain half-ounces of cocaine from Medina. 'Davis' overheard Medina tell others in the past to have their money to him by Friday so that he can pay [defendant] for the drugs. 'Davis' said that [defendant] transports the drugs from an unknown location, possibly Chicago, Illinois, to Medina's residence. This transfer typically occurs on Fridays after 5:00 P.M. 'Davis' said that Medina liked to have the cocaine delivered on Friday so he has it for the weekend. *** Medina and [defendant] are lifelong friends and have both been involved in the Satan Disciples street gang and drug dealing together for many years. 'Davis' has known Medina and [defendant] for many years and was able to positively identify both males."

¶ 21                            d. Defendant's Residences and Vehicles

¶ 22    Henry averred that defendant used to reside at 209 6th Avenue in Sterling, and that he had been known to drive a 2009 Land Rover Range Rover. Officers had observed defendant's vehicle at 209 6th Avenue several times in the past. Recently, officers received new information that defendant traded in his Range Rover for a black Maserati and that he paid cash for a new house at 907 3rd Avenue in Sterling. Henry averred that the 2008 Maserati had been registered to defendant at the new address. On or about February 24, 2017, officers received information that defendant traded in the Maserati for a black 2015 Dodge Ram. The Dodge Ram was registered to defendant at 907 3rd Avenue. Officers observed the Dodge Ram parked in front of that address and also observed defendant driving that vehicle.

¶ 23                            e. Additional Background Information

¶ 24    The complaint additionally set out that defendant, Vaughn, and Medina were documented Satan Disciple gang members with criminal histories. Defendant's criminal history included

convictions/sentences for delivery of a controlled substance, possession of a controlled substance, unlawful use of weapons, and possession of liquor by a minor. Defendant was currently on parole. Smith and Davis also had criminal histories.[3]

¶ 25                                    2. The Parties' Contentions

¶ 26    In support of his motion to quash the search warrant and suppress the evidence, Defendant argued that (1) the electronic tracking device was not necessary; (2) the warrant affidavit failed to establish either informant's reliability or credibility; (3) there existed an insufficient basis of knowledge to support either informant's hearsay information; (4) law enforcement failed to corroborate either informant's hearsay information; (5) the alleged probable cause supporting the search warrant was stale; and (6) the search warrant lacked any nexus between a violation of the Illinois Controlled Substances Act (720 ILCS 570/100 *et seq.* (West 2016)), and defendant's Dodge Ram and failed to describe the objects to be seized with sufficient particularity.

¶ 27    The State responded generally that the confidential informants' information was corroborated, reliable, and sufficient to establish probable cause. The State also argued that the information was not stale, because defendant had only recently owned the 2015 Dodge Ram and the nexus between it and defendant was established.

¶ 28                                    3. The Trial Court's Ruling

---

[3] Defendant argued that Henry failed to disclose that Smith had been arrested on drug charges in October 3, 2016. The State responded that the information Henry relied on from Smith was in April and May 2016 and that Henry was unaware of Smith's subsequent arrest. The State conceded that Smith was an addict.

¶ 29    On June 20, 2019, the trial court issued a memorandum opinion and order, granting defendant's motion. The court found that "the most persuasive argument set forth by defendant is that the information used in the complaint for search warrant was stale." The court noted that the information from Smith was at least ten months old and that, thus, the time frame for Smith's alleged drug purchases from defendant was October 2014 through April 2016. The court further noted that Smith's information about defendant's address and vehicle was outdated and that Smith's last contact with defendant was on May 16, 2016, when Smith unsuccessfully attempted to arrange a drug purchase. The court noted that the information from Davis, although closer in proximity to the complaint for the search warrant, was still at least four-and-a-half months old, when Davis allegedly heard Medina tell someone " 'in the past' " to have their money to Medina by Friday so that he could pay defendant for the drugs. The court stated that "there is no time frame provided as to when Davis allegedly overheard this conversation and when Davis knows, or how, that the defendant transports drugs from an unknown location." The court also noted that there was no information indicating that Davis had ever purchased drugs from defendant or in his presence. The court concluded that the "uncorroborated information provided by both confidential informants *** [was] so remote in time that it could not form the basis for a probable cause finding." Last, the court stated: "The information in the complaint for search warrant also fails to provide sufficient information to reach the conclusion the defendant was recently engaged in ongoing, continuing, criminal activity."

¶ 30                    B. Proceedings on the State's Motion to Reconsider

¶ 31    On July 19, 2019, the State filed a motion to reconsider, in which it contended that: (1) the trial court did not express any deference to the issuing judge's conclusion that there was a substantial basis for probable cause; (2) the court should address defendant's diminished

expectation of privacy that comes with his status as a parolee; (3) the court should reconsider its finding of staleness; and (4) "the court should consider the inevitable discovery of the stop and search." Defendant did not file a written response.

¶ 32    A hearing took place on July 26, 2019. Following the hearing, the trial court denied the motion to reconsider, stating:

> "Thank you. The Court has considered the arguments of counsel. Although perhaps not specifically stated in terms of, I gave great deference to the issuing judge, I did give great deference to the issuing judge when I reached this opinion. I struggled for hours with the facts and what was set forth in the affidavit and actually, in my opinion, went to great lengths in my own mind to try to uphold the issuing court's decision to issue the GPS tracking warrant at the time. It just could not pass the staleness hurdle.

> Although the parolee has a low expectation of privacy, the Court agrees with the State when the State makes that comment, that does not mean he has no expectation of privacy. The State still has to meet the requirements of the Fourth Amendment. The State of Illinois has passed a statute specifically on the installation of a GPS tracker. The State has to meet the burden with respect to that, which is a low burden, probable cause. However, the information the State offered to the issuing judge of the GPS tracker warrant, it was stale and at best you can say the information was four and a half months old but even that information had no date. The comment by [Davis] that sometime in the past he overheard one of the gang members say you have to have your money here by Friday, that's when I pay [defendant] for the drugs. I don't know if that was a day ago, a year ago, ten years ago. In this Court's opinion the information offered to the issuing court was too stale to support a finding of probable cause."

¶ 33    The State filed a certificate of impairment (see Ill. S. Ct. R. 604(a)(1) (eff. July 1, 2017)) and a timely notice of appeal.

¶ 34                                II. ANALYSIS

¶ 35    On appeal, the State contends that there was a substantial basis for the issuing judge to conclude that there was probable cause for a search warrant. More specifically, the State argues that Henry's affidavit provided probable cause to believe that defendant, a parolee with prior convictions for the distribution of drugs and drug possession, was maintaining a relationship with his longtime gang, the Satan Disciples, and participating with members of the gang in a drug distribution chain. According to the State, defendant's status as a parolee, and the severely diminished expectation of privacy that comes with that status, renders the search in this case reasonable under the circumstances. The State further argues that, even if this court considers this a doubtful or marginal case, the preference to be accorded search warrants requires that the warrant be upheld. In the alternative, the State argues (for the first time on appeal) that the good-faith exception applies.

¶ 36    In response, defendant contends that the trial court properly determined that the confidential information in the affidavit was stale. Defendant also argues that the confidential information was insufficient to support a finding of probable cause; he challenges the informants' reliability, veracity, and bases of knowledge and notes the absence of any police corroboration. Defendant also argues that the confidential information failed to establish a nexus between the Dodge Ram and the offense. Defendant also maintains that defendant's parolee status is a "red herring," because this was not a parolee search and, in any event, defendant's status as a parolee did not extinguish his expectation of privacy. Regarding the State's alternative good-faith-

exception argument, defendant contends that it has been forfeited because the State raised it for the first time on appeal.

¶ 37    The fourth amendment to the United States Constitution provides:

> "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const., amend. IV.

Article I, section 6, of the Illinois Constitution similarly prohibits the issuance of a warrant absent a showing of probable cause "supported by affidavit particularly describing the place to be searched and the persons or things to be seized." Ill. Const. 1970, art. I, § 6.

¶ 38    "[T]he Government's installation of a [tracking] device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search.' " *United States v. Jones*, 565 U.S. 400, 404 (2012). Under section 10 of the Freedom from Location Surveillance Act (Act) (725 ILCS 168/10 (West 2016)), "a law enforcement agency shall not obtain current or future location information pertaining to a person or his or her effects without first obtaining a court order *** based on probable cause to believe that the person whose location information is sought has committed, is committing, or is about to commit a crime or the effect is evidence of a crime," unless an enumerated exception found in section 15 of the Act applies. Exceptions under section 15 include "an electronic device used as a condition of *** parole." 725 ILCS 168/15(4) (West 2016). There is no evidence here that defendant's parole conditions included the placement of an electronic tracking device. Thus, under section 10 of the Act, a court order based on probable cause was required.

¶ 39 The existence of probable cause for a search warrant "turns on the totality of the circumstances and facts known to the officers and court when the warrant is applied for." (Internal quotations and citations omitted.) *People v. Manzo*, 2018 IL 122761, ¶ 29. Probable cause exists "when the totality of the facts and circumstances within the affiant's knowledge at the time the warrant is applied for 'was sufficient to warrant a person of reasonable caution to believe that the law was violated and evidence of it is on the premises to be searched.' " *Id.* (quoting *People v. Griffin*, 178 Ill. 2d 65, 77 (1997). Probable cause does not require proof beyond a reasonable doubt; rather, it requires only the probability of criminal activity. *Id.* "A judge asked to issue a search warrant may draw reasonable inferences from the material supplied." *People v. Beck*, 306 Ill. App. 3d 172, 179 (1999).

¶ 40 As our supreme court noted in *Manzo*, whether the probability of criminal activity exists "is governed by commonsense considerations that are factual and practical, rather than by technical rules." *Manzo*, 2018 IL 122761, ¶ 30.

> "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place."
> *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

"[T]he term 'basis of knowledge' refers to how [an] informant has acquired information that has been given to police." *People v. Sims*, 192 Ill. 2d 592, 617 (2000). "The basis of knowledge inquiry is not a separate or independent test which must be satisfied in order to establish probable cause. [Citation.] Rather, an informant's basis of knowledge is simply a relevant factor to be considered

as part of the totality of the circumstances." *Id.* at 618. Where a defendant challenges the reliability of an informant, the court considers

"several factors, such as the informant's personal observations, the degree of detail given, independent police corroboration of the *** information and whether the informant testified at the probable cause hearing. [Citation.] No single issue is dispositive; a deficiency in one factor may be compensated for by a strong showing in another or by some other indication of reliability.' " (Internal quotation marks omitted.) *People v. Smith*, 372 Ill. App. 3d 179, 183 (2007) (quoting *United States v. Johnson*, 289 F.3d 1034, 1038-39 (7th Cir.2002), abrogated on other grounds).

¶ 41 We turn to our standard of review. In *Manzo*, 2018 IL 122761, ¶ 25, our supreme court stated as follows:

"A circuit court's ruling on a motion to suppress presents questions of both fact and law. [Citation.] A circuit court's finding of fact is given deference when ruling on a motion to suppress and will be reversed only when those findings of fact are against the manifest weight of the evidence. [Citation.] If the reviewing court accepts the trial court's factual findings, it conducts a *de novo* review of whether suppression was appropriate under those facts. [Citation.]"

¶ 42 Here, as noted, the parties agreed below to proceed on the "four corners" of the complaint for a search warrant and reserve remaining issues for a future hearing. The trial court held no evidentiary hearing on the motion to suppress and made its decision solely on a review of the complaint. For purposes of this review, the court took as true the allegations of the complaint and made no independent findings of fact. Likewise, our review on appeal assumes the truth of the complaint's allegations, and since there are no factual findings, we owe the trial court no deference

but rather review *de novo* its assessment of the complaint. We are in the same posture as if the trial court made factual findings and we "accept[ed]" them for purposes of our review, as the court referenced in *Manzo* (*id.*). See *People v. Brown*, 2014 IL App (2d) 121167, ¶ 23 ("Generally speaking, where the only issue is whether the complaint and supporting affidavit established probable cause, our analysis is of the issuing judge's initial determination of probable cause, not the trial court's assessment thereof on a motion to quash and suppress."); *People v. Lyons*, 373 Ill. App. 3d 1124, 1127 (2007) ("We review *de novo* a trial court's ruling on a motion to suppress when the underlying facts are not in dispute and the only question is the adequacy of the affidavit attached to the complaint for the warrant.").

¶ 43     However, even when we review *de novo* the trial court's assessment of a complaint for a warrant, we must show proper deference to the issuing judge. As the court in *Manzo* emphasized, "[a] reviewing court must not substitute its judgment for that of the magistrate in construing an affidavit but must instead merely decide whether the magistrate had a substantial basis for concluding that probable cause existed." *Manzo*, 2018 IL 122761, ¶ 31. " 'Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants.' " *People v. Stewart*, 104 Ill. 2d 463, 477 (1984) (quoting *United States v. Ventresca*, 380 U.S. 102, 109 (1965)).

¶ 44     With the preceding legal principles in mind, we turn to the merits. We agree with the State that there was a substantial basis for the issuing judge to conclude that there was probable cause for a warrant. The information offered in support of the warrant here was not stale. Information is considered stale when too much time has elapsed between "the evidence of a crime[] having been committed and the complaint for a search warrant." *People v. Rehkopf*, 153 Ill. App. 3d 819, 822

(1987). As we stated in *Rehkopf*, "the single most important factor in determining whether probable cause is valid or stale is whether or not the defendant was engaged in a continuing course of criminal conduct." *Id.* at 823. "There is no hard and fast rule concerning the time within which a search warrant should be made." *People v. Sellers*, 237 Ill. App. 3d 545, 548 (1992).

¶ 45 Defendant argues that the information provided by the informants was stale; the information from Smith was 11 months old and the information from Davis was 4 months old. Defendant relies on five cases in support of his argument. Three of those cases found that the warrants at issue were not based on stale information. See *People v. Thompkins*, 121 Ill. 2d 401, 434-36 (1988) (83-day delay between the murders at issue and the search warrant for a codefendant's home, seeking telephone extension cords, bloodstains, and hair fibers, was not too long, where it was reasonable to infer that the evidence was still in existence); *People v. Donath,* 357 Ill. App. 3d 57, 67 (2005) (five-month delay between the time that the defendant uploaded 304 images of child pornography and the issuance of the warrant did not render the information stale, given that the number of images and the fact that he uploaded them made it reasonable to infer that the defendant was a collector of child pornography); *Sellers*, 237 Ill. App. 3d at 548 (15-day delay in issuing the warrant was not unreasonable, where the informant advised that he had seen marijuana in the defendant's residence 15 days earlier, that the defendant had sold marijuana at the house for the past six years, and that he had personally purchased marijuana from the defendant). To be sure, the periods between receipt of information and issuance of the warrant were shorter in *Thompkins* and *Sellers* than in this case. However, *Donath*, with a five-month delay, exemplifies that there is no set period within which information becomes too stale to supply probable cause.

¶ 46     Two of the cases relied on by defendant found that the warrants were based on stale information. See *Rehkopf*, 153 Ill. App. 3d 819, and *People v. Damian*, 299 Ill. App. 3d 489 (1998). In *Rehkopf*, we found that a 13-month lapse between the last date of information concerning the defendant's possession of silencer parts and the issuance of the warrant was insufficient to establish that the defendant had the parts in his home, especially given information that the parts were intended for personal use, that the parts were easily moved, and that "there was no suggestion in the affidavit that defendant was in the business of selling silencer parts or otherwise engaged in a continuing course of criminal activity." *Rehkopf*, 153 Ill. App. 3d at 823.

¶ 47     In *Damian*, the First District found that a six-week lapse between a single controlled purchase of cocaine from the defendant and issuance of the warrant was too long. *Damian*, 299 Ill. App. 3d at 492. In that case, the controlled buy took place on December 16, 1995, with an informant referred to as " 'John Doe.' " *Id.* at 490. On February 1, 1996, Doe reported to officers that he observed the defendant with cocaine. *Id.* The warrant was issued that day. *Id.* In finding the six-week lapse too long, the court specifically noted that there was no information in the warrant that the defendant, during the six-weeks, was engaged in a continuing course of criminal conduct. *Id.* at 492. The court also noted that Doe's allegation that the defendant possessed cocaine was vague, in that it did not state where the defendant possessed the cocaine on February 1, 1996. *Id.*

¶ 48     *Rehkopf* and *Damian* are readily distinguishable from the present case. First, we note that, with respect to *Rehkopf*, the period at issue here with respect to Davis's information is much shorter. Moreover, there was no evidence in either *Rehkopf* or *Damian* that the defendants were engaged in ongoing criminal activities. In *Rehkopf*, the evidence showed that the defendant

purchased silencer parts on two consecutive days thirteen months earlier and that they were intended for personal use. In *Damian*, the evidence involved a single controlled purchase.

¶ 49    As noted, the single most important factor in determining whether probable cause is valid or stale is whether or not the defendant was engaged in a continuing course of criminal conduct. See *Rehkopf*, 153 Ill. App. 3d at 823. Here, the totality of the facts and circumstances within Henry's knowledge when he sought the warrant was sufficient to warrant a person of reasonable caution to believe that defendant was engaged in a continuing course of criminal activity, and thus the warrant was not based on stale information.

¶ 50    First, Davis provided important information to establish that defendant was involved in ongoing criminal activity. Davis reported that, on November 1, 2016, Medina told him that Vaughn was coming to Medina's house about twice per week to obtain half-ounces of cocaine. Davis reported that he "overheard Medina tell others in the past to have their money to him by Friday so that he can pay [defendant] for the drugs." Davis also stated that "[defendant] transports the drugs from an unknown location, possibly Chicago, Illinois, to Medina's residence. This transfer typically occurs on Fridays after 5:00 P.M." The trial court determined Davis's information too "remote in time" because Davis did not provide a time frame for when defendant was transporting drugs to Medina's house. In making this determination, the trial court focused on the words "in the past." Although Davis's comment about what Medina told others "in the past," standing alone, was arguably too remote to form the basis for a probable cause determination, when read in context with Davis's subsequent comment that "[defendant] transports the drugs from an unknown location" and that "*[t]his transfer typically occurs on Fridays*" (emphasis added), it is clear that Davis was referring to an ongoing and *present* situation.

¶ 51    Davis's basis of knowledge and his veracity were established under the totality of the circumstances. Davis indicated that he knew about the Satan Disciple street gang, which stemmed from his interactions with various Satan Disciple members. Defendant, Vaughn, and Medina were "documented Satan Disciples street gang member[s]." Davis had known defendant and Medina for many years and was able to positively identify them. Although defendant argues that the affidavit did not show that Davis had ever purchased drugs from defendant or show any type of interaction between Davis and defendant, Davis provided information to Henry about the Satan Disciples street gang and discussed extensive historical drug information involving defendant, Vaughn, and Medina, which, according to Henry, was consistent with the information that had been reported to police by other sources.

¶ 52    In addition, Davis's August 2016 statements concerning the usual practices involved in his typical drug transactions with Satan Disciple street gang member Vaughan were corroborated when, on September 19, 2016, Davis participated in a controlled drug purchase from Vaughn at Vaughn's residence. Vaughn provided Davis with 15 grams of cocaine with the agreement that Davis would pay Vaughn at a later date. Davis was given $400 in prerecorded funds and later traveled to Vaughn's mother's house, and paid Vaughn $400. Following the payment, surveillance officers followed Vaughn to Medina's house. During both transactions, Davis's conversations with Vaughn were recorded and Davis was under constant surveillance. Thus, although this drug transaction did not directly involve defendant, it corroborated Davis's information about the Satan Disciple street gang drug operations and further enhanced his reliability.

¶ 53    Smith's information is also an important factor to consider in establishing defendant's involvement in a continuing course of criminal conduct. On April 26, 2016, Smith advised that she had purchased cocaine from defendant approximately 30-40 times over the past year to year-and-

a-half. Based on her estimation, the time frame during which she bought drugs from defendant was generally from October 2014 through April 2016. The number of transactions over the extended period allows for a reasonable inference that defendant had more than a casual involvement in drugs. Smith's connection with defendant was confirmed when, on May 16, 2016, Smith had a Facebook messenger conversation with defendant to arrange a drug transaction. Henry viewed the message and confirmed that the profile was attached to defendant. Henry averred that the drug transaction did not occur because defendant wished to exchange sex for drugs. Smith further advised that, "in the past," she drove defendant to an area in Cicero, where defendant exited the vehicle, met with a man, and returned to Smith's vehicle with a brown lunch sack containing what appeared to Smith to be cocaine. Smith did not provide a date for "in the past," but her information suggests that defendant was heavily involved in drug trafficking from at least October 2014 to May 2016.

¶ 54    Like Davis, Smith had firsthand knowledge of the Satan Disciple street gang, which stemmed from her relationship with one of the gang's members. Smith positively identified defendant, defendant's car, and his home address. Although the information she provided concerning defendant's car and home address was outdated at the time of complaint, it was accurate during the period relevant to her involvement with defendant. In addition, Smith had previously cooperated with Sterling police officers for purposes of conducting controlled purchases while wearing an eavesdropping device. Henry averred that Smith "has captured incriminating conversations which corroborated previously obtained intelligence."

¶ 55    Standing alone, Smith's information arguably would not have been sufficient to support a finding of probable cause for the warrant issued in March 2017. However, her information,

together with the information from Davis and other pertinent facts and circumstances, established a fair probability that defendant was still engaged in the criminal drug trade in March 2017.

¶ 56 Defendant argues that Davis's and Smith's information was not sufficient to support a finding of probable cause, because they did not personally appear before the magistrate. To be sure, the informant's very presence before a magistrate (even if not testifying) establishes an indicia of reliability. See *People v. Wise*, 2019 IL App (2d) 160611, ¶¶ 71-72. However, it is but one factor to consider in assessing an informant's reliability. We should note that both Davis and Smith, as confidential (but known) informants, are deemed more reliable than an anonymous informant. *People v. Monroy-Jaimes*, 2019 IL App (2d) 160426 ¶ 17. That is because a known informant's "reputation can be ascertained and *** can be held accountable if a tip turns out to be fabricated." *People v. Sanders*, 2013 IL App (1st) 102696, ¶ 19. Thus, although Smith and Davis did not personally appear, the fact that they were both known weighs in favor of reliability.

¶ 57 Defendant also argues that the affidavit did not cite a single instance where law enforcement received information from either informant that resulted in an arrest or conviction. See *People v. Beck*, 167 Ill. App. 3d 412, 419 (1988). Nevertheless, we note that Davis's information about his past drug deals with the Satan Disciples street gang proved true when he conducted a drug transaction consistent with his descriptions. The fact that the police did not arrest Vaughn does not take away from the fact that Davis's information concerning Vaughn was verified. Smith too had previously cooperated with Sterling police officers for purposes of conducting controlled purchases while wearing an eavesdropping device.

¶ 58 Defendant also argues that Davis's information concerning defendant was uncorroborated by the police and that Davis provided no firsthand knowledge about defendant. Although the critical tip provided by Davis concerning defendant's acts of delivering drugs to Medina on Fridays

was not corroborated, Henry explained in the affidavit that covert tracking in such a situation was difficult. As noted, other information provided by Davis was corroborated.

¶ 59    Nevertheless, the information provided by Davis and Smith did not stand on its own. There were other factors for the court to consider in determining whether the totality of the circumstances established a substantial basis for the issuing court to conclude that probable cause existed. For instance, the affidavit also set forth defendant's criminal history, which included convictions for unlawful delivery of a controlled substance and possession of a controlled substance. See *People v. Watson*, 214 Ill. 2d 271, 288 (2005) (the totality of circumstances supporting a finding of probable cause included the defendant's prior convictions for offenses similar to those being investigated). Defendant was also a documented member of the Satan Disciples.

¶ 60    Further, the affidavit established that defendant was currently on parole. Although we agree with defendant that his "parolee status did not extinguish his expectation of privacy," we agree with the State that a parolee's status is a factor for the issuing judge to consider in the totality of the circumstances. We find *People v. Wilson*, 228 Ill. 2d 35 (2008), instructive on this issue. In *Wilson*, the supreme court upheld the warrantless search of the defendant's bedroom, given his status as a parolee and the plain language of a search condition contained in his mandatory supervised release [MSR] agreement. *Id.* The court relied on the holding in *Samson v. California*, 547 U.S. 843 (2006), that "the reduced expectation of privacy a parolee has is further diminished by his acceptance of the clear and unambiguous terms of the search condition contained in his parole agreement." *Wilson*, 228 Ill. 2d at 48 (citing *Samson*, 547 U.S. at 852). The court noted that parolees remain in the legal custody of the Department of Corrections for the duration of their parole and that the search condition contained in the MSR agreement puts parolees on notice that law enforcement officials may search their person, property, or residence at any time, with or

without reasonable suspicion. *Id.* at 48-50. In its holding, the court focused on parolees' "greatly diminished expectation of privacy due to their status as *** parolees, and the salient government interest in preventing recidivism and protecting society from future crimes." *Id.* at 41. Citing *Samson*, the court explained that if searches of parolees required suspicion, parolees would have a greater opportunity to anticipate searches and conceal criminality, which would undermine the government's ability to effectively supervise parolees. *Wilson*, 228 Ill. 2d at 45-46 (citing *Samson*, 547 U.S. at 854). The court confirmed that the fourth amendment does not prohibit a police officer from conducting a suspicionless search of a parolee, his property, or his residence. *Id.* at 52; see also *People v. Johnson*, 2020 IL App (1st) 172987, ¶ 35 (same).

¶ 61    Defendant argues that his parolee status is a "red herring." He argues that the cases relied on by the State are distinguishable, because the search here (1) was pursuant to a warrant, (2)  was unrelated to defendant's parolee status, and (3) involved electronic tracking rather than a one-time search. While those distinctions may be accurate, we find that principles announced in those cases nevertheless apply here. Defendant, as a parolee, had a "greatly diminished expectation of privacy" (*Wilson*, 228 Ill. 2d at 41), which is a factor to consider in considering the totality of the circumstances.

¶ 62    Defendant also argues that the State failed to establish a nexus between the criminal activity and the 2015 Dodge Ram, because neither informant ever reported seeing defendant drive the Dodge Ram. However, Henry averred that defendant traded in his 2009 Land Rover Range Rover for a black Maserati, which had been registered to defendant at the new address, and that, on or about February 24, 2017, defendant traded in the Maserati for a black 2015 Dodge Ram. The Dodge Ram was registered to defendant at his current address. This took place less than two weeks before the Henry filing the sworn complaint. Henry averred that officers had recently witnessed

defendant driving the Dodge Ram and had seen it parked at defendant's residence. The issuing judge could reasonably infer that defendant would drive the Dodge Ram to Chicago.

¶ 63    Based on the foregoing, we hold that the information in the warrant established an ongoing course of criminal conduct. As noted, defendant has prior convictions for delivery of a controlled substance and possession of a controlled substance. He is a documented member of the Satan Disciple street gang. Davis provided information about the gang's drug operations and that same information had also been reported by other sources. Henry was privy to extensive historical drug information involving several members. Smith advised that she had purchased drugs from defendant approximately 30-40 times between October 2014 and April 2016. As we noted above, the number of transactions over the extended period allows for a reasonable inference that defendant had more than a casual involvement in drugs. Smith also advised that she drove defendant to Cicero where he purchased what appeared to her to be cocaine. Moreover, Smith's Facebook interaction with defendant in May 2016 showed that he was then still dealing drugs. Smith's information about defendant's drug activity from October 2014 to May 2016, together with Davis's information in November 2016 that defendant was transporting drugs to Medina's house on Fridays, certainly allows for an inference that defendant was continuing his criminal course of conduct in March 2017. Even if the court were to consider this a close case, " 'the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants.' " *Stewart*, 104 Ill. 2d at 477 (quoting *Ventresca*, 380 U.S. at 109.

¶ 64    Accordingly, based on the foregoing, we hold that the totality of the facts and circumstances contained in the sworn complaint for a search warrant, along with the reasonable inferences drawn therefrom, provided a substantial basis for the issuing magistrate to conclude that there was probable cause to believe that defendant was engaged in a continuing course of criminal

conduct. We need not consider the State's alternative argument that, even if the warrant was not supported by probable cause, the evidence is otherwise admissible under the good-faith exception to the exclusionary rule.

¶ 65                                III. CONCLUSION

¶ 66     For the reasons stated, we reverse the judgment of the circuit court of Lee County and remand for further proceedings.

¶ 67     Reversed and remanded.