NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 230346-U

NO. 4-23-0346

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 18, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Warren County |
| CHRISTOPHER J. LEWIS, | ) | No. 20CF32 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | James R. Standard, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Justices Harris and Knecht concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The circuit court's 15-year sentence was not an abuse of discretion. The court
properly found the evidence did not support a sentence of probation. It did not err
by considering prior allegations defendant abused two girls in the 1990s. The
court complied with the statutory bases for imposing consecutive sentences.

¶ 2    Defendant, Christopher J. Lewis, is serving a 15-year sentence in the Illinois
Department of Corrections (DOC) pursuant to a plea agreement. Defendant pleaded guilty to two
counts of attempted criminal sexual assault (720 ILCS 5/8-4(a), 11-1.20(a)(3) (West 2018)),
Class 2 felonies; one count of aggravated domestic battery (720 ILCS 5/12-3.3(a-5) (West
2018)), a Class 2 felony; and one count of grooming (720 ILCS 5/11-25 (West 2018)), a Class 4
felony. In exchange, the State agreed to dismiss the remaining counts. There was no agreement
as to sentence. Although defendant was eligible for probation, the circuit court sentenced him to

DOC. Defendant filed a posttrial motion seeking reconsideration of his sentence, which the court denied. Defendant appeals. We affirm.

¶ 3                                                    I. BACKGROUND

¶ 4             In March 2020, the State charged defendant with nine counts relating to conduct that occurred between June 1, 2018, and October 31, 2018. The State alleged defendant attempted to sexually assault his stepdaughter, B.M., and committed aggravated battery against her. In October 2020, the State added two more charges, criminal sexual assault and grooming, for a total of 11 charges against defendant. Defendant posted bond and was initially released with the condition he have no contact with B.M., either directly or indirectly. Defendant violated his bond when he e-mailed a letter to B.M.'s mother asking her to give it to B.M. The State then charged defendant with violation of his bail bond, a Class A misdemeanor, in Warren County case No. 20-CM-25.

¶ 5             The State and defendant entered into a partially negotiated plea agreement on March 1, 2022, whereby defendant would plead guilty to four counts and the State would dismiss the remaining seven counts. The parties did not agree on a sentence, leaving it to the circuit court to decide. Per the agreement, defendant entered guilty pleas on the following charges: two counts of attempted criminal sexual assault (720 ILCS 5/8-4(a), 11-1.20(a)(3) (West 2018)), Class 2 felonies, with a sentencing range of three to seven years on each count; one count of aggravated domestic battery (720 ILCS 5/12-3.3(a-5) (West 2018)), a Class 2 felony, with a sentencing range of three to seven years; and one count of grooming (720 ILCS 5/11-25 (West 2018)), a Class 4 felony, with a sentencing range of one to three years. The court ordered a presentence investigation report and directed defense counsel to submit defendant's sex offender evaluation.

¶ 6       The circuit court held a sentencing hearing on May 13, 2022, which began with the court confirming the sentencing ranges with the parties. The court then confirmed with the parties that all counts were probation-eligible but consecutive sentencing was also available.

¶ 7                    A. The State's Evidence in Aggravation

¶ 8       The State called three witnesses and admitted several exhibits.

¶ 9                              1. *B.M.*

¶ 10       B.M., the victim in this case, testified she was currently 17 years old. She stated her mother, T.M., married defendant in February 2018, and they lived together full-time afterwards, though B.M. visited her father every other weekend. She recalled the events giving rise to this case took place between June 1, 2018, and October 31, 2018, when she was 12 or 13 years old. B.M. testified she and her stepsister, W.L (defendant's biological daughter), were sleeping in a tent in their backyard when she heard her mom's truck start and leave. This was not unusual since her mom would sometimes get called into work during the night. Defendant then came out to the tent and told the girls to go in the house. He had them sleep in his bed with him and arranged for B.M. to sleep between him and W.L. B.M. fell back asleep but later awoke with defendant's hand under her panties and rubbing her "clit area" in a circular motion. She began "freaking out and saying that [she] wanted to sleep on the couch." She got out of the bed and defendant followed her to the kitchen. As B.M. tried to go to the couch, defendant grabbed her arm and demanded she take off her pants. When she said no, he forced her to the ground. B.M. testified she was lying on her back and defendant was straddling her. He began choking B.M., telling her "we could do this the easy way or the hard way." He threatened to go to B.M.'s little sister if B.M. did not comply with his demands. B.M. testified she could not breathe, but she was able to free herself by "kicking [defendant] in the private area."

¶ 11        Upset and crying, B.M. grabbed her phone, dialed 9-1-1, and went upstairs. She told defendant she would make the call if he came upstairs. B.M. testified defendant began apologizing to her and asked to talk with her outside. He told her "like, he didn't mean to do it and if I told my mom, it would ruin their relationship and destroy the family." B.M. testified she believed that, but she did tell W.L. what happened later that morning.

¶ 12        B.M. testified defendant never touched her or attacked her again. But he would "make sexual jokes *** and show [her] sexual memes about stepdaughters and stepfathers." She said defendant would show her the memes when her mother was not home. B.M. estimated defendant showed her memes or made sexual jokes "pretty often,"—"at least once a day." B.M. recalled defendant making sexual comments daily. He would talk about buying her lingerie. He would show her pictures of "Stripper lingerie" and asked if she wanted him to buy it for her. He once offered to let her skip school and take her to a sex toy shop.

¶ 13        B.M. testified she did not tell an adult what happened until her mom called her in February 2020 and asked her if defendant had ever done anything to her sexually. B.M. said she "kind of freaked out and ended up telling her." B.M. eventually spoke with police.

¶ 14        B.M. recalled defendant wrote her a letter, which her mom printed out and gave her. B.M. said she never read the letter. She testified she knew defendant drove by their apartment and waved at her siblings after he bonded out of jail, but she did not see him.

¶ 15        B.M. testified she had begun therapy. She said she suffers from paranoia, anxiety, depression, panic attacks, and nightmares and has difficulty trusting others. Her therapist told her she would need long-term treatment for post-traumatic stress disorder. B.M.'s testimony concluded with her reading her victim impact statement.

¶ 16                                    2. *T.M.*

¶ 17        T.M. testified she began dating defendant in May 2017, and she married him on February 10, 2018. Her three children lived with them full-time, and his two children lived with them part-time. T.M. stated she was a nurse and would occasionally get called into work in the middle of the night. She testified her marriage to defendant began to unravel in early 2020. She learned defendant had an affair with a man. She knew he had affairs with women, but this behavior surprised her and made her wonder if he had betrayed her in other unexpected ways. She called B.M., who was at her father's house for the weekend, and asked if anything ever happened between B.M. and defendant. B.M. told her what occurred, and T.M. contacted the police.

¶ 18        T.M. recalled "a few *** two or three times" of defendant "making an inappropriate sexual joke" to B.M. She remembered the jokes being "about stepdaughters in general" and not B.M. specifically.

¶ 19        T.M. testified about finding a camera charging in her and defendant's bedroom in March 2018. She looked up the camera on defendant's computer and found two videos from it. One video showed B.M. undressing and getting into the shower. The second video showed W.L. undressing and getting into the shower. Both videos were taken in the family's upstairs bathroom. From T.M.'s view, neither girl knew they were being recorded while in the bathroom. T.M. confronted defendant about the videos, and he admitted he purchased the camera and put it in the bathroom. "[H]e wasn't sure why" he did it, but he said watching pornography "wasn't satisfying him and that he wanted something more real." Defendant admitted he had a problem with pornography. He apologized to T.M. and said it would never happen again. T.M. testified she disposed of the camera. She did not go to the police.

¶ 20         T.M. then testified about lewd text messages defendant sent her concerning B.M., stepdaughters, their children, and others. Defendant once suggested having a sexual encounter with T.M. and B.M. He once joked about giving the children (including B.M.) sleep aids so he could perform sex acts on them. He once texted a picture of B.M.'s softball bat and said B.M. could get it back if she paid $20 or sent him nude pictures. In the course of another text message thread about B.M., defendant sent a picture of a young female with a penis up to her lips. In another text message exchange, he sent two pictures in quick succession—one of a person grabbing a female's breast and the second a picture of B.M. Defendant sent T.M. text messages about sedating B.M. with alcohol or medication. He texted about spying on daughters, hypothetically. In one text thread, defendant joked about buying B.M. wine and teaching her to de-stress with sex toys. He likewise suggested T.M. take B.M. to a sex toy party. When T.M. and B.M. were shopping for homecoming dresses, defendant texted T.M. asking her to send him pictures of the girls undressing, saying, "Feed the inner perv today."

¶ 21         T.M. testified she initially participated in therapy with defendant to save their marriage because she did not believe in divorce. At the time of sentencing, she believed defendant had been manipulating her. T.M. testified defendant e-mailed her a letter he wrote to B.M. She stated she printed out the letter, folded it, and put it on the counter for B.M. T.M. testified she told B.M. she could read the letter if she wanted to. T.M. said she read the letter and believed it was manipulative.

¶ 22         As part of direct examination, T.M. read her victim impact statement. On cross-examination, T.M. reiterated she was the one who gave B.M. the letter and she was the one who told B.M. defendant drove by their apartment after he bonded out of jail. She noted defendant

took responsibility for his conduct in the letter he wrote to B.M. She further stated defendant was a good parent and otherwise interacted appropriately with their children.

¶ 23                                    3. *Laurence Knicl*

¶ 24        Laurence Knicl, a retired special agent with the Illinois State Police, testified about a September 2000 investigation into defendant's conduct with his two younger sisters-in-law in the early 1990s. Knicl attended interviews with the two alleged victims at the Galesburg Department of Children and Family Services (DCFS). He noted he reviewed his investigative report and the DCFS reports before testifying.

¶ 25        Knicl testified S.H. was 13 years old in September 2000. S.H. was defendant's former sister-in-law. Defendant had been married to S.H.'s sister, Jennifer, from 1990 to 1997. During their marriage, Jennifer's younger sisters, S.H. and C.E., lived with them. S.H. told interviewers that beginning in 1991 or 1992, when she was four or five years old, defendant had her put her mouth on his penis. She remembered defendant making her perform oral sex multiple times. She told the interviewers defendant also digitally penetrated her.

¶ 26        Knicl testified he also viewed C.E.'s interview with DCFS in Galesburg. C.E. was 22 years old in September 2000. She had stated that in 1991, when she was 13 years old, defendant forced her to the ground and said he was going to rape her, but he was interrupted when the phone rang. During the summers of 1991 through 1994, defendant touched C.E.'s vagina, made her perform oral sex, and had vaginal intercourse with her multiple times. He sometimes used force and threats to make C.E. comply with these demands.

¶ 27        The State asked the circuit court to take judicial notice of Warren County case No. 01-CF-16, where defendant had been charged for the incidents involving S.H. Defendant had not been charged for acts done to C.E. because the statute of limitations barred prosecution at the

time. In case No. 01-CF-16, the court did not allow the State to introduce other-crimes evidence relating to defendant's acts against C.E., and the appellate court affirmed that decision. See *People v. Lewis*, 327 Ill. App. 3d 1136, 815 N.E.2d 1008 (2002). Consequently, the State eventually dropped the case against defendant. The defense did not object to Knicl's testimony, nor did it object to the exhibits admitted during the testimony or the court taking judicial notice of case No. 01-CF-16. On cross-examination, Knicl noted the case originated in Indiana. He recalled defendant and Jennifer had already divorced when the interviews took place.

¶ 28     The State ended its presentation of evidence with two victim impact statements, one from B.M.'s father, and one from W.L., read by W.L.'s mother, R.M. The defense objected to the latter statement, arguing W.L. did not qualify as a victim under the governing statute. The circuit court allowed the statement over defendant's objection.

¶ 29                          B. The Defense

¶ 30     The defense called multiple witnesses and submitted exhibits to the circuit court. Angela Lewis, defendant's older sister, testified her brother had a good relationship with their parents. She noted their father had several health problems and defendant would be able to help their parents if released from jail. Peter Ogorzalek, a correctional officer at the Warren County Sheriff's Office, testified he had known defendant for two years, since defendant was arrested. He reported he never had to discipline defendant and was not aware of any other officer having a problem with defendant. Ogorzalek described defendant as polite and said he helped other inmates.

¶ 31     Michael Griswold testified he had known defendant since defendant was a child, but he really got to know him over the past 20 years. The two men were both contractors and sometimes worked together. Griswold testified to defendant's good work ethic. He noted

- 8 -

defendant got along well with customers. Griswold testified he did not see defendant outside the work environment, though he trusted defendant to watch his house and dog when he went on vacation. Griswold stated he would not hesitate to recommend defendant for jobs. William Edley, Griswold's son-in-law, testified he met defendant through Griswold. He described defendant's work ethic as "excellent." He testified he had recommended defendant for jobs in the past and would still recommend him for jobs. Edley reported he owned a duplex in Peoria, Illinois, and he would allow defendant to live there. He confirmed there were no churches or schools near the duplex. On cross-examination, Edley said he knew of the charges against defendant, but he did not know the details.

¶ 32 Defendant took the stand last. He testified about the investigation into the allegations he sexually abused his first wife's sisters. He recalled the investigation began in 2000 after he and his ex-wife, Jennifer, discussed their son living with defendant. He testified he heard from friends that Jennifer was "concerned that [defendant] was trying to take her to court and start a custody battle." Defendant testified he believed the abuse allegations levied against him in 2000 were fabricated to prevent him from having custody of his son.

¶ 33 Defendant recounted his employment history as a police officer, emergency medical technician, and contractor. He discussed the various trainings he completed. He testified he also taught about gun use and emergency response. He noted he and T.M. tried starting a nonprofit organization that would teach churches and organizations to promptly deal with emergency medical situations. He did trainings for the Monmouth-Roseville school district.

¶ 34 Defendant testified he completed an online "class that addressed pornography and sexual sin" through an organization called Faithful Manner. He chose that class because it was the only one available to him online. He did the class voluntarily, and he successfully completed

it. Defendant testified he planned to seek treatment for pornography and sex addiction when released. He inquired into a program through Pure Life Ministries, which offered online and in-person services. Defendant further noted he would help his parents, work, and attend church if released. In his statement in allocution, defendant asked for forgiveness and asked for mercy from the court. He explained he pleaded guilty because he is "a strong believer in accountability." He believed he could be a productive member of society if given the opportunity.

¶ 35 On cross-examination, defendant again stated he believed the allegations levied against him in 2000 were fabricated. He acknowledged he did not seek help for himself and his problems with pornography and sex addiction until after he was arrested. He admitted he never sought help for B.M. because he was afraid his conduct would be disclosed or discovered.

¶ 36 C. Sentencing Recommendations

¶ 37 The State began its recommendation by addressing defendant's sex offender evaluation, which had found defendant "to be a moderate risk, category three, *** [an] average risk, and *** about half of sex offenders fit in this category, and it's in the middle of the distribution." The State argued there were deficiencies in the evaluation, which were important to note because defendant was eligible for probation. The State noted defendant did not inform the evaluator that he violated his bond by contacting B.M. Similarly, he "stated to the evaluator he denied planning sexual offending behavior" but "instead he reported a more impulsive opportunistic response to a circumstance," even though he admitted to grooming B.M. The State further noted defendant never told the evaluator he surreptitiously filmed B.M. and W.L. undressing, which should cast doubt on the evaluator's conclusion that defendant addressed his pornography issues through the online course he completed. The State also questioned the

metrics and actuarial tables the evaluator used. The State concluded, "Based on the totality of the information that's come before the Court, which seems to be a lot more than what the sex offender evaluator had, the State certainly feels this is not an adequate sex offender evaluation."

¶ 38　　　　　The State recommended a 15-year aggregate sentence in DOC on all four felony counts. It recommended time served for the misdemeanor offense in case No. 20-CM-25. The State asked the circuit court to require sex offender registration, impose a fine, and order restitution to cover the cost of B.M.'s therapy. The State noted defendant should get credit for 599 days served in the county jail. The State believed no factors in mitigation applied to this case.

¶ 39　　　　　The defense asked for a sentence of probation for all charges. Defense counsel argued the sentences should run concurrently and be "the maximum length of probation." He recommended "[t]he usual terms of probation," including "follow the sex offender rules as required by the registry." Defense counsel agreed with the restitution amount and suggested defendant's "bond money *** could be applied. There should be sufficient bond money. The larger the fine, the more that is eaten up, though. So we would recommend a fine of $500 and so that the restitution amount is covered as well as any amounts for future counseling that is necessitated."

¶ 40　　　　　Defense counsel maintained the basis for its recommendation was "statutory," noting "the legislature has given you guidance how to proceed in these cases." Defense counsel argued "the legislature has deemed these cases probationable and there's a presumption in favor of probation." Defense counsel went on to argue seven statutory mitigating factors applied to this case, and, in turn, "looking at the factors in mitigation, I don't believe this presumption has been overcome." Counsel reiterated defendant already spent almost 600 days in jail, "not an

insignificant amount of time for someone who has not previously served." Similarly, he noted defendant lost a lot in terms of family and reputation due to his actions. Counsel noted defendant pleaded guilty, which spared B.M. from testifying in a trial.

¶ 41    Counsel rebuffed the State's request for consecutive sentences, noting defendant's crime "was a continuing course of action." He expounded, "I don't know how you can get past the presumption of probation and then skip way ahead and go to consecutive sentencing when the intent of the consecutive sentencing is—according to the memo, is to be used sparingly."

¶ 42    Defense counsel did not share the State's concerns about the sex offender evaluation. Counsel did not "know if the result would have been different if Dr. Amy would have had the knowledge that the State believes she should have had. Those are questions that she could have been asked if she were here."

¶ 43    Defense counsel asked the circuit court to "tak[e] into account the entire life of [defendant] and not just this five minutes of extremely poor decisionmaking [*sic*]." He argued, "a sentence of probation is not condoning what happened. [Defendant] has accepted responsibility for that, and he's ready here to accept your decision in this case. But I think if you follow the guidance set forth by our statutes that the presumption of probation has not been overcome, and we would ask that that be the Court's sentence."

¶ 44    On rebuttal, the State reiterated its view that no statutory factors in mitigation applied to this case. It argued, "overall, I do believe that we have overcome the presumption as he states of probation given the nature of the charges given the ongoing criminal nature of his actions. And I do believe that he should be sentenced not only to the [DOC], but to consecutive sentencing as I stated."

¶ 45        The circuit court took a brief recess to review cases discussed during the arguments, but it soon returned to pronounce the sentence. The court found several statutory factors in aggravation, namely: defendant's conduct caused or threatened serious harm; the sentence imposed is necessary to deter others; and defendant held a position of trust or supervision as a family member to the victim. The court explained it "is not double-counting the fact that the defendant here held a position of trust in the family. I recognize the difficulties in treating that unduly, and this Court is not considering it in that manner." The court stated it considered the evidence presented in the hearing, the presentence investigation report, defendant's statement in allocution, counsel's arguments, and the statutory and nonstatutory factors in aggravation and mitigation. The court noted it could not determine if defendant was likely or unlikely to reoffend. It observed defendant "had another [facet] to his character and his conduct." The court noted there was no evidence defendant needs psychiatric treatment and concluded:

> "So I don't believe the Court can find that he is unlikely to commit another crime. The Court is not finding that he is likely to. I think that is a wash. By that, I mean I don't think the evidence is that he's unlikely to or has a propensity to do so."

¶ 46        Next, the circuit court stated it was "troubled" by defendant's conduct, including "his persistent lobbying of his wife about sexual conduct and also intimating sexual references to [B.M.], and, of course, the video." The court found "the evidence shows that [defendant] did make the bathroom video of the two girls and what appears to be persistent and pernicious effort on the part of the defendant here to ultimately—the prize ultimately was to have some type of sexual contact with this child, and that was pursued over a period of time."

¶ 47       The circuit court then referenced the standard for consecutive sentencing and then stated,

> "I do find at this time, and I express my finding, that I believe consecutive sentences are necessary here considering the history, the nature and circumstances of the offense and history and character of the defendant, that consecutive sentence are required to protect the public from further criminal conduct by the defendant for the reasons that have been made part of the record at this point."

The circuit court next found "the evidence does not support that the defendant is presumptively entitled to probation."

¶ 48       With that, the circuit court announced it was "accepting the recommendation of the State here as to the initial sentence." Accordingly, it imposed the following sentence: five years in DOC on count III; five years in DOC on count VI; seven years in DOC on count VII; and 3 years in DOC on count XI. Except for counts III and VII, which would be served concurrently to each other, the sentences would run consecutively, for an aggregate 15-year term. The court imposed four years of mandatory supervised release. It ordered defendant to report as a sex offender. It credited defendant with 599 days served. It ordered him to pay $2000 in restitution. The court sentenced defendant to time served for the misdemeanor violation of his bond in case No. 20-CM-25.

¶ 49       Defendant filed two postsentencing motions on June 10, 2022. He first filed a motion to withdraw a plea of guilty and vacate the judgment, arguing his plea was not made knowingly, voluntarily, or both. Defendant also filed a motion to reconsider the sentence, raising

several arguments: the State did not overcome the presumption of probation; the circuit court improperly considered unsubstantiated prior alleged bad acts of defendant in determining the sentence; the court improperly considered W.L.'s victim impact statement; defendant should have received probation; and the court erred in imposing consecutive sentences.

¶ 50          On March 16, 2023, the circuit court held a hearing on defendant's motions. Without objection from the State, defendant did not proceed with his motion to withdraw the guilty plea and pursued only the motion to reconsider the sentence. Defense counsel argued the court erred in allowing W.L.'s victim impact statement into evidence because W.L did not qualify as a victim. It also took issue with the court allowing R.M. to read the statement for W.L. Defense counsel next argued the court erred in considering "the 30-year-old criminal incident, which did not—did not result in a conviction." Counsel noted the alleged victims did not testify and were not subject to cross-examination. Counsel argued the evidence was not reliable and should not have been considered. Counsel believed this evidence led the court to impose consecutive sentences. The defense otherwise relied on the arguments in its written motion. The State opposed the defense's motion, arguing W.L. qualified as a victim because she was a household member and was in the room when the first assault took place. The State also argued the evidence of defendant's past conduct with S.H. and C.E. was admissible and rightly considered. On rebuttal, the defense acknowledged the prior-bad-acts evidence was admissible but argued it was unreliable and not probative since it was based on decades-old interview notes.

¶ 51          In giving its decision, the circuit court noted the significance of defendant having counsel and the opportunity to cross-examine witnesses at the sentencing hearing. The court reviewed the parties' arguments and observed, "I've not heard an argument today that the Court violated a specific statute in imposing the sentences that were imposed here." Rather, the court

noted the arguments debated whether the court abused its discretion in allowing W.L.'s victim impact statement, in hearing evidence of years-old conduct by defendant, and in imposing consecutive sentences. The court described itself as "a copious notetaker" and explained it reviewed its notes from the sentencing hearing. It also reviewed the materials prepared by court services, parsed the parties' postsentencing motions, and read case law submitted from the parties. The court found: "I believe I gave what weight the evidence deserved in my consideration." The court explained "[it] was primarily concerned with the offense or offenses at hand: what took place, what happened, and the nature of that conduct. How egregious was it? How difficult was it? When I say 'difficult,' I mean what—what effects *** resulted from the defendant's conduct." Accordingly, the court denied defendant's motion to reconsider the sentence.

¶ 52          Defendant appeals.

¶ 53                              II. ANALYSIS

¶ 54          On appeal, defendant challenges his sentence by raising three arguments, stating the circuit court erred by (1) "failing to recognize the strong presumption of probation in [this] case, where the State did not meet its burden of overcoming this presumption," (2) "considering unsubstantiated and alleged prior immoral acts of the defendant in determining defendant's sentence," and (3) "sentencing defendant to consecutive sentences to be served in [DOC]."

¶ 55                          A. Standard of Review

¶ 56          A circuit court enjoys broad discretion when sentencing a defendant. *People v. Etherton*, 2017 IL App (5th) 140427, ¶ 26, 82 N.E.3d 693. "[A] sentence will be disturbed on appeal only if the sentencing court abused its discretion." *People v. Quintana*, 332 Ill. App. 3d 96, 109, 772 N.E.2d 833, 845 (2002). An abuse of discretion will not be found unless the court's

sentencing decision is "arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the *** court." *Etherton*, 2017 IL App (5th) 140427, ¶ 26. We afford the court's sentencing decision "deference because it is generally in a better position than the reviewing court to determine the appropriate sentence" because it had the opportunity to personally observe the defendant, witnesses, and all other evidence as it was presented. *Etherton*, 2017 IL App (4th) 140427, ¶ 26. Likewise, we indulge "a strong presumption that the [circuit] court based its sentencing determination on proper legal reasoning" and considered all evidence before it. *People v. Donath*, 357 Ill. App. 3d 57, 72, 827 N.E.2d 1001, 1015 (2005).

¶ 57                              B. The Presumption of Probation

¶ 58          Defendant argues the circuit "court's failure to recognize and apply the strong presumption of probation in [this] case constitutes a significant error in the application of sentencing principles." He bases this argument on what he terms Illinois law's "robust presumption in favor of probation when determining an appropriate sentence for a defendant." Though he cites no authority describing the strength of any such presumption, he directs our attention to subsection 5-6-1(a) of the Unified Code of Corrections (Code) (730 ILCS 5/5-6-1(a) (West 2022)), which addresses probation. It provides, in relevant part:

> "Except where specifically prohibited by other provisions
> of this Code, the court shall impose a sentence of probation or
> conditional discharge upon an offender unless, having regard to the
> nature and circumstance of the offense, and to the history,
> character and condition of the offender, the court is of the opinion
> that:

> (1) his imprisonment *** is necessary for the protection of
> the public; or
>
> (2) probation or conditional discharge would deprecate the
> seriousness of the offender's conduct and would be inconsistent
> with the ends of justice." 730 ILCS 5/5-6-1(a) (West 2022).

Defendant contends the court did not make proper findings about protecting the public from him or deprecating the seriousness of his offense and, therefore, its "departure from the presumption of probation [was] inappropriate." We disagree.

¶ 59        The circuit court unequivocally recognized probation as a sentencing option for defendant and confirmed this with the parties at the sentencing hearing. The parties' arguments addressed probation and debated whether the State overcame the presumption for probation. After hearing all this, the court rejected probation as a sentencing option and expressly found "the evidence does not support that the defendant is presumptively entitled to probation." Defendant seeks to inject uncertainty into this conclusion by highlighting the court's indecision about whether defendant would reoffend. The court said,

> "I don't believe the Court can find that [defendant] is unlikely to
> commit another crime. The Court is not finding that he is likely to.
> I think that is a wash. By that, I mean I don't think the evidence is
> that he's unlikely to or has a propensity to do so."

Defendant reasons this statement cannot be squared with an opinion that incarcerating him is necessary to protect the public. Again, we disagree. Even when the evidence does not allow the circuit court to make a conclusive finding about a defendant's likelihood to reoffend in the

- 18 -

future, a court can reasonably find the public needs to be protected, given the defendant's past and present offenses. It appears this is what happened here.

¶ 60    In reviewing the nature and circumstances of the offense and defendant's history and character—as required by subsection 5-6-1(a)—the circuit court said it was "troubled" by defendant's actions and labeled his conduct "persistent and pernicious." The court rebuffed defendant's argument that his attack on B.M. amounted to "five minutes of extremely poor decisionmaking [*sic*]." It referenced defendant secretly placing a video camera in the family bathroom to record his biological daughter and stepdaughter undressing and getting into the shower. The court also noted defendant's "persistent lobbying" of T.M. about inappropriate sexual topics, for example, sending him pictures of teenage girls undressing so he could "[f]eed the inner perv" and suggesting sex acts with children, including B.M. And as for defendant's history, there was evidence suggesting he committed similar crimes in the past that went unprosecuted. Defendant prided himself on taking accountability, but he did not do that here until he had to. He was not forthright during his sex offender evaluation, omitting certain details that could have elevated his risk level beyond "moderate."

¶ 61    Though it couched the finding in terms of consecutive sentences, the circuit court expressly found imprisonment in DOC was "required to protect the public from further criminal conduct by the defendant for the reasons that have been made part of the record at this point." Because the determination on probation necessarily precedes a determination on consecutive sentencing, we see no problem with the court combining those evaluations. To be sure, both determinations require the court to consider the same factors, the nature and circumstances of the offense along with the defendant's history and character. Compare 730 ILCS 5/5-6-1(a) (West 2022) with 730 ILCS 5/5-8-4(c)(1) (West 2022). The court considered those factors here and

determined the public needed to be protected from defendant and eliminated probation as a sentencing option. Based on the evidence in the record, we cannot say this conclusion is unreasonable, arbitrary, fanciful, or that no reasonable person could come to that conclusion; consequently, the court did not abuse its discretion. *Etherton*, 2017 IL App (5th) 140427, ¶ 26.

¶ 62                          C. Evidence of Prior Allegations

¶ 63          Defendant next contends the circuit court erred by considering "unproven and untested allegations that were not subject to meaningful cross-examination in the determination of [his] sentence" and, therefore, "departed from the principles of justice and fairness that are integral to the sentencing process." Specifically, defendant attacks the evidence he allegedly molested his first wife's younger sisters in the early 1990s, which the State admitted through Knicl's testimony and two exhibits documenting interview notes from the DCFS investigation. Notably, defendant did not object to this evidence in the sentencing hearing. And during the hearing on his motion to reconsider the sentence, he acknowledged the evidence was admissible, but he argued it should not have been considered. So, any argument as to admissibility would be waived (see *People v. Gilker*, 2023 IL App (4th) 220914, ¶ 91), but he does not seem to make an admissibility argument here.

¶ 64          Defendant's actual argument on appeal is curious, to say the least. He argues the evidence was "incompetent" and improperly considered. Without giving a definition or example for "incompetent evidence," he cites our supreme court's opinion in *People v. Jackson*, 149 Ill. 2d 540, 548, 599 N.E.2d 926, 930 (1992), for the proposition that evidence of "other criminal conduct for which there has been no prosecution or conviction may be considered in sentencing. Such evidence, however, should be presented by witnesses who can be confronted and cross-examined, rather than by hearsay allegations in the presentence report, and the defendant should

- 20 -

have the opportunity to rebut the testimony." Aside from Knicl's testimony technically constituting hearsay evidence, defendant points to no other reason why this evidence did not comport with *Jackson*. Indeed, Knicl testified, defendant confronted and cross-examined him, and defendant had the opportunity to rebut the evidence. Plus, the fact that Knicl's testimony amounted to hearsay evidence is not fatal. Tellingly, *Jackson* cautioned against "hearsay allegations *in a presentence report*," which could not be confronted or cross-examined. (Emphasis added.) *Jackson*, 149 Ill. 2d at 548. *Jackson* did not caution against all hearsay evidence—probably because it is well-established that "[h]earsay evidence is admissible at sentencing." *People v. Ivy*, 313 Ill. App. 3d 1011, 1019, 730 N.E.2d 628, 636 (2000) (citing *People v. Pickens*, 274 Ill. App. 3d 226, 233, 653 N.E.2d 778, 783 (1995)).

¶ 65        The *Jackson* court, however, instructed evidence considered in a sentencing hearing must be relevant and reliable. *Jackson*, 149 Ill. 2d at 549. Knicl's testimony and the exhibits documenting the interviews with S.H. and C.E. were relevant and reliable. We have said "[u]ncharged criminal conduct is relevant in a sentencing determination." *Ivy*, 313 Ill. App. 3d at 1019 (citing *People v. Flores*, 153 Ill. 2d 264, 296, 606 N.E.2d 1078, 1094 (1992)). There is no doubting the relevance of evidence defendant committed similar attacks years before. As for reliability, Knicl testified he recalled the interviews with S.H. and C.E. and had the opportunity to review the reports from those interviews, which further refreshed his recollection regarding the 2000 investigation into defendant's conduct. This evidence, therefore, was rightly admitted and properly considered by the circuit court—even if the court did not give it much weight, as happened here. The court explained in the hearing on defendant's posttrial motion that it considered all the evidence before it, but it "was primarily concerned with the offense or offenses at hand." This is borne out by reviewing the sentencing hearing transcript. When discussing the

evidence, the court highlighted the facts in this present case. It did not dwell on defendant's past conduct. We presume the court exercised sound legal reasoning when determining a sentence. *Donath*, 357 Ill. App. 3d at 72. We also defer to the circuit court's sentencing decisions because it personally observes the defendant, witnesses, and all other evidence. *Etherton*, 2017 IL App (4th) 140427, ¶ 26. Consequently, based on this record, we cannot conclude the court abused its discretion when considering Knicl's testimony and the accompanying exhibits. *Quintana*, 332 Ill. App. 3d at 109.

¶ 66                                    D. Consecutive Sentences

¶ 67        Defendant finally argues the circuit "court erred by sentencing [him] to consecutive sentences" in DOC. He points to his "clean criminal and work record[s]" and his " 'moderate risk' score in the sex offender evaluation," contending "the court's decision to impose consecutive sentences without sufficiently weighing these mitigating factors contributed to an unjust and disproportionate punishment."

¶ 68        Section 5-8-4 of the Code governs consecutive sentences, sometimes making them permissive and sometimes making them mandatory. 730 ILCS 5/5-8-4(c), (d) (West 2022). This case involves permissive consecutive sentencing, meaning the circuit court had discretion to impose consecutive sentences on defendant, "[i]f, having regard to the nature and circumstances of the offense and the history and character of the defendant, it is the opinion of the court that consecutive sentences are required to protect the public from further criminal conduct by the defendant, the basis for which the court shall set forth in the record." 730 ILCS 5/5-8-4(c)(1) (West 2022). Our review of the record confirms the court's sentencing method and determination comported with the statute.

¶ 69　　　　　　Taking method first, the circuit court quoted subsection 5-8-4(c)(1) verbatim. It then recounted how it considered all the evidence, the presentence investigation report, defendant's statement in allocution, counsels' arguments, and the statutory factors in aggravation and mitigation. By reviewing everything before it, the court necessarily took into account the statutory considerations—the nature and circumstances of the crime and defendant's history and character. Then, when announcing the sentence, the court made an express finding for consecutive sentences, saying: "I believe consecutive sentences are necessary here considering the history, the nature and circumstances of the offense and history and character of the defendant, that consecutive sentences are required to protect the public from further criminal conduct by the defendant for the reasons that have been made part of the record at this point." See *People v. Kyle*, 194 Ill. App. 3d 827, 829, 551 N.E.2d 730, 731 (1990) (affirming consecutive sentences when, "[f]rom the trial judge's remarks at time of sentence, it is clear that he understood the dictates of section 5-8-4[ ]").

¶ 70　　　　　　Turning to the determination itself, we note the record supports the circuit court's decision that consecutive sentences were necessary to protect the public. The evidence covered defendant's history and revealed police investigated allegations he sexually assaulted his sisters-in-law, who were minors at the time. The State brought charges in one case, which were eventually dismissed when the State received an unfavorable evidentiary ruling. Here, the court rightly noted it could consider uncharged or unprosecuted criminal conduct during sentencing. See *Ivy*, 313 Ill. App. 3d at 1019 ("Uncharged criminal conduct is relevant in a sentencing determination.").

¶ 71　　　　　　The evidence detailing these crimes showed defendant pursued and groomed his stepdaughter for sex. He set up a video camera in the family bathroom and recorded B.M. and

W.L. undressing and getting in the shower. He downloaded the video to his personal computer because, as he admitted to his wife, pornography was no longer satisfying him, and he wanted something more real. When he saw an opportunity to satiate his desires, he took it. He brought B.M and W.L. to his bed once his wife left for work. He pursued B.M. after she left the bedroom, cornered her in the kitchen, forced her to the ground, started to choke her, and threatened to assault her younger sister if she did not comply. When B.M. fought back, he halted the attack and transitioned to manipulating her to keep quiet. But defendant did not stop his ultimate pursuit of B.M. For nearly two years, he kept making sexual jokes or comments to B.M., sending her inappropriate pictures or memes. He often texted T.M. about lewd topics, even suggesting sex acts with their children or taking pictures of teenage girls to "[f]eed [his] inner perv."

¶ 72      The people living in defendant's home were not safe from him and needed protection. Yet, he argued to the circuit court (and again now) that the public would be safe if he were placed on probation. The court did not buy that argument then, and we do not buy it now. Yes, defendant completed a faith-based online class addressing "pornography and sexual sin." He had maintained employment as an adult. He did trainings for schools on emergency situations. He did not have any criminal convictions. The court considered these as part of defendant's history and character and still opined consecutive sentences were necessary. That decision is not unreasonable, arbitrary, or fanciful—it is not an abuse of discretion. *Etherton*, 2017 IL App (5th) 140427, ¶ 26. We will not disturb it. *Quintana*, 332 Ill. App. 3d at 109.

¶ 73                III. CONCLUSION

¶ 74      For these reasons, we affirm the circuit court's judgment and sentence.

¶ 75      Affirmed.